**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4154
_____

NATIONAL SECURITY SYSTEMS, INC.;
STEVEN CAPPELLO;
UNIVERSAL MAILING SERVICE, INC.;
MICHAEL MARONEY, SR.; MICHAEL MARONEY, JR.;
LIMA PLASTICS, INC.;
JOSE M. CARIA, also known as JOSEPH M. CARIA;
MARGIT GYANTOR;
FINDERNE MANAGEMENT COMPANY, INC.;
ROCQUE DAMEO; DANIEL DAMEO;
ALLOY CAST PRODUCTS, INC.;
KENNETH FISHER; FRANK PANICO

v.

ROBERT L. IOLA, JR.; JAMES W. BARRETT;
GERARD T. PAPETTI;
CIGNA FINANCIAL ADVISORS INC;
LINCOLN NATIONAL LIFE INSURANCE COMPANY;
U.S. FINANCIAL SERVICES CORPORATION;
RONN REDFEARN; STEVEN G. SHAPIRO;
TRI-CORE, INC.;
COMMONWEALTH LIFE INSURANCE COMPANY;
MONUMENTAL LIFE INSURANCE COMPANY;
PEOPLES SECURITY LIFE INSURANCE COMPANY;
RAYMOND J. ANKNER; BEAVEN COMPANIES, INC.;
CJA ASSOCIATES, INC.;
NATIONSBANK TEXAS TRUST;
RIGGS NATIONAL BANK; PNC BANK N.A.;
BANK OF AMERICA

1

UNIVERSAL MAILING SERVICE, INC.;
MICHAEL MARONEY, SR.; MICHAEL MARONEY, JR.;
LIMA PLASTICS, INC.; JOSE M. CARIA, also known as
JOSEPH M. CARIA; MARGIT GYANTOR;
FINDERNE MANAGEMENT COMPANY, INC.;
ROCQUE DAMEO; DANIEL DAMEO;
ALLOY CAST PRODUCTS, INC.;
KENNETH FISHER; FRANK PANICO,

Appellants

_____

No. 10-4155
_____


NATIONAL SECURITY SYSTEMS, INC.;
STEVEN CAPPELLO;
UNIVERSAL MAILING SERVICE, INC.;
MICHAEL MARONEY, SR.; MICHAEL MARONEY, JR.;
LIMA PLASTICS, INC.;
JOSE M. CARIA, also known as JOSEPH M. CARIA;
MARGIT GYANTOR;
FINDERNE MANAGEMENT COMPANY, INC.;
ROCQUE DAMEO; DANIEL DAMEO;
ALLOY CAST PRODUCTS, INC.;
KENNETH FISHER; FRANK PANICO

v.

ROBERT L. IOLA, JR.; JAMES W. BARRETT;
GERARD T. PAPETTI;
CIGNA FINANCIAL ADVISORS INC;
LINCOLN NATIONAL LIFE INSURANCE COMPANY;
U.S. FINANCIAL SERVICES CORPORATION;
RONN REDFEARN; STEVEN G. SHAPIRO;
TRI-CORE, INC.;
COMMONWEALTH LIFE INSURANCE COMPANY;
MONUMENTAL LIFE INSURANCE COMPANY;
PEOPLES SECURITY LIFE INSURANCE COMPANY;

RAYMOND J. ANKNER; BEAVEN COMPANIES, INC.;
CJA ASSOCIATES, INC.;
NATIONSBANK TEXAS TRUST;
RIGGS NATIONAL BANK; PNC BANK N.A.;
BANK OF AMERICA


JAMES W. BARRETT,

Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 3-00-cv-06293)
District Judge:  Honorable Anne E. Thompson

Argued November 16, 2011

Before:  FUENTES and CHAGARES, <u>Circuit Judges</u>, and
RESTANI, <u>Judge</u>.[*]

(Filed: November 8, 2012)

Steven J. Fram, Esq. (Argued)
Kerri E. Chewning, Esq.
Archer & Greiner
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033

Counsel for Appellants / Cross-Appellees

Edward M. Koch, Esq.
White & Williams
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103

Christopher P. Leise, Esq. (Argued)

_____

[*] Honorable Jane A. Restani, Judge, United States Court of
International Trade, sitting by designation.

White & Williams
457 Haddonfield Road
Suite 400, Liberty View
Cherry Hill, NJ 07095

Counsel for Appellee / Cross-Appellant

_____

OPINION

_____

CHAGARES, <u>Circuit Judge</u>.

We are called upon once again to address litigation arising out of a tax avoidance scheme devised in the late 1980s.[1] Defendant James Barrett, a financial planner, induced the plaintiffs, four small New Jersey corporations and their respective owners, to adopt an employee welfare benefit plan known as the Employers Participating Insurance Cooperative ("EPIC"). EPIC's advertised tax benefits, the plaintiffs discovered years later, were illusory; the scheme masqueraded as a multiple employer welfare benefit plan, but in fact was a method of deferring compensation. After the Internal Revenue Service audited the plaintiffs' plans and disallowed certain deductions claimed on their federal income tax returns, the plaintiffs initiated this suit against Barrett and other entities involved in the scheme. They asserted claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461; the civil component of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961-1968; and New Jersey statutory and common law. A jury found Barrett liable on the plaintiffs' common law breach of fiduciary duty claim, but

_____

[1] This Court has, on at least three occasions, considered claims arising out of employee welfare benefit plans with tax avoidance features resembling the scheme at the root of this case. See <u>Cetel v. Kirwan Fin. Grp., Inc.</u>, 460 F.3d 494 (3d Cir. 2006); <u>Neonatology Assocs., P.A. v. Comm'r</u>, 299 F.3d 221 (3d Cir. 2002); <u>Faulman v. Sec. Mut. Fin. Life Ins. Co.</u>, 353 F. App'x 699, 2009 WL 4367311 (3d Cir. Dec. 3, 2009).

4

not liable on their RICO claim. The District Court held a bench trial on the ERISA claim and issued partial judgment for the plaintiffs.

The parties raise a litany of challenges to rulings made by the District Court over the course of the proceedings. Several of their claims present matters of first impression in this Circuit. For the reasons that follow, we will affirm the District Court in most respects. On the issues of whether the District Court properly deemed certain state law causes of action preempted by ERISA, properly held certain ERISA claims time-barred, and properly limited the jury's consideration of one theory of recovery under RICO, we will vacate and remand for further proceedings.

I.[2]

A.

EPIC was a complex tax avoidance scheme designed to exploit 26 U.S.C. § 419A(f)(6), a tax code provision that exempts "10-or-more-employer plans" from limitations on employers' deductions for contributions to employee welfare benefit plans. See IRS Notice 95-34, 1995-1 C.B. 309. Promoters of EPIC marketed it to closely held corporations as a means of obtaining two attractive tax benefits: pre-retirement, it permitted employers to claim large deductions for contributions to employee benefit plans, and post-retirement, it promised owner-employees a stream of tax-free, annuity-like payments. Defendant Ronn Redfearn, a now-deceased insurance salesman, created EPIC. He formed defendant Tri-Core, Inc., a corporation that has since filed for bankruptcy protection, to administer employee benefit plans that conformed with EPIC's specifications.

EPIC purported to be a multiple employer welfare benefit plan and trust, but in fact was an umbrella structure within which discrete employee welfare benefit plans operated. To join EPIC, a participating corporation signed a standard form contract drafted by Tri-Core and titled the

_____

[2] We recount the facts based on the findings made by the District Court in the bench trial.

5

"EPIC Welfare Benefit Plan and Trust Adoption Agreement" ("Adoption Agreement"). An Adoption Agreement established an employee welfare benefit plan funded by employer contributions, set up a trust to hold plan assets, and generally bound the employer to the terms of participation in EPIC. It denominated the employer as the plan fiduciary and administrator, but also required the employer to delegate "substantial ministerial functions" to Tri-Core. In particular, Tri-Core was responsible for formulating rules necessary to administer the plans, determining employees' eligibility for benefits, processing claims, collecting and accounting for premiums, and directing others with respect to plan administration.

Tri-Core selected two group term life insurance policies as the only investment vehicles for the plans. The Inter-American Insurance Company of Illinois initially issued the policies, but after it declared bankruptcy in 1991, defendant Commonwealth Life Insurance Company ("Commonwealth") began issuing the policies. One of the products, the Millennium Group 5 ("MG-5") policy, provided participants with a fixed pre-retirement death benefit, charged premiums commensurate with risk, and extended to participants an option to convert to an individual life insurance policy upon retirement or termination of employment.

The second product was the continuous group ("C-group") policy. A C-group policy consisted of two phases: an accumulation phase and a payout phase. In the accumulation phase, the employer made contributions (in the form of insurance premiums) to a group term life insurance policy that funded a guaranteed pre-retirement death benefit for an employee's beneficiaries. The policies were valued at a multiple of the employee's most recent annual salary. C-group premiums far exceeded premiums for conventional life insurance policies, often by a multiple of four to six. The portion of the premium necessary to fund the death benefit was set aside for that purpose. The remainder of the premium — the difference between the C-group premiums and the actual cost of insuring the employee's life — was reserved as so-called "conversion credits." Conversion credits were maintained in a "premium stabilization reserve fund," an

account that guaranteed policy holders a minimum interest rate.

To transition to the payout phase, the employee could convert from the group term life insurance policy to an individual life insurance policy. Conversion could occur under five circumstances, including retirement or termination of employment. Upon conversion, the death benefit from the group policy would transfer to the employee's individual policy, as would conversion credits from the interest-bearing account. The value of the transferred conversion credits was calculated at the time of conversion and was not guaranteed. A portion of the conversion credits was earmarked for lowering the post-retirement premium to the premium associated with the employee's age at the time of entry into EPIC rather than at the time of conversion. Surplus conversion credits not necessary for keeping the policy in force were then made available to the employee, who could borrow against the policy at an interest rate identical to that of the interest-bearing account in which the conversion credits were held. That is, the employee could withdraw funds from the policy as a loan that would never be repaid. In this way, the employee could access, as tax-free income, excess funds paid as "contributions" by the employer to the plan.

As mentioned, EPIC called for establishment of a trust to hold and manage each plan's assets. A number of banks were designated trustees of EPIC plans over the course of EPIC's operation. In practice, Tri-Core, not the trustees, directed the management of plan assets; the trustee operated only as a pass-through entity. When an employer adopted an EPIC plan, Tri-Core instructed the trustee to purchase the mix of MG-5 and C-group life insurance products selected by the employer. The employer then deposited its contributions with the bank trustee on a biannual or quarterly schedule, and the trustee remitted the premiums to Commonwealth's general asset account. Commonwealth thereafter placed a portion of the payments in the premium stabilization reserve fund.

As the architect, promoter, and manager of EPIC, Tri-Core received a commission from Commonwealth on each C-group policy it sold. Commonwealth paid Tri-Core out of its general asset account and set the commission rate at a

percentage of the employers' annual contributions. Tri-Core typically received up to 85% of employer contributions in the first year of the policy and approximately 6% in subsequent years, and then redistributed part of its commission to the insurance broker who sold the EPIC plans.

B.

Redfearn enlisted defendant James Barrett in 1989 to market EPIC to closely held corporations with few employees and principals between the ages of 45 and 60. At the time, Barrett was a financial planner employed by Cigna Financial Advisors, Inc. In the years that followed, Barrett provided financial planning advice to each of the plaintiffs: Michael Maroney, Sr. and Michael Maroney, Jr., executive officers of Universal Mailing Service, Inc. (collectively, the "Universal Mailing plaintiffs"); Jose Caria and Margit Gyantar, executive officers of Lima Plastics, Inc. (collectively, the "Lima Plastics plaintiffs"); Rocque Dameo and Daniel Dameo, executive officers of Finderne Management Company, Inc. (collectively, the "Finderne plaintiffs"); and Kenneth Fisher and Frank Panico, executive officers of Alloy Cast Products, Inc. (collectively, the "Alloy Cast plaintiffs").[3] We hereinafter refer to the four corporations as the "corporate plaintiffs" and the eight executive officers as the "individual plaintiffs."

Acting as Tri-Core's regional agent for New Jersey, Barrett introduced EPIC to the individual plaintiffs and recommended that their companies establish employee benefit plans within the EPIC umbrella. Barrett plied them with projections of their tax-free retirement income, brochures and other marketing materials produced by Tri-Core, and a legal opinion letter that vouched for the validity of the favorable tax benefits.[4] Employers' inflated

---

[3] Two additional plaintiffs, National Security Systems, Inc. and Steven Cappello, settled their claims and are not involved in this appeal.

[4] Trial testimony disclosed Barrett's knowledge of a published article that questioned the validity of the EPIC model. Appendix ("App.") 6649-52, 6659. The District Court made no findings of fact with respect to Barrett's

contributions to the plans' group insurance policies, Barrett represented, were fully deductible as business expenses, and employees with C-group policies could expect tax-free retirement income. Barrett did not explain that the conversion credits — the source of the projected post-retirement income — were not guaranteed, but in fact were calculated by Tri-Core at the time of conversion.

Finding Barrett persuasive, each of the corporate plaintiffs elected to establish an employee welfare benefit plan within EPIC. They did so primarily because they believed that it would provide them a tax-advantageous way to save for retirement. Between 1990 and 1992, each executed an Adoption Agreement with Tri-Core. Per the Adoption Agreements, the corporate plaintiffs assumed the role of sponsor and administrator of their employee welfare benefit plans. As administrators, they selected one of the two life insurance products designated by Tri-Core — the MG-5 policy or the C-group policy — for each employee. On Barrett's recommendation, the corporate plaintiffs purchased C-group policies for each of the individual plaintiffs and MG-5 policies for other employees in the company. In other words, the individual plaintiffs designed the plans to generate tax-free post-retirement income for themselves, but not for their employees. As required by their Adoption Agreements, the corporate plaintiffs delegated most of their plan management and investment duties to Tri-Core.

Tri-Core and Barrett (acting as an agent of Tri-Core) frequently sent the corporate plaintiffs invoices for their quarterly or biannual premiums. They also collected the corporate plaintiffs' plan contributions and forwarded the payments to the trustees. Barrett served as Tri-Core's contact person for the plaintiffs, fielding their inquiries about plans and benefits. He was not named a fiduciary of the employers' plans, nor did he have discretion to manage or invest plan assets.

The Universal Mailing and Alloy Cast plaintiffs were notified when they established their plans that Tri-Core would

awareness that EPIC posed tax risks to participating employers.

9

receive a commission on the purchase of their life insurance contracts, but they were not provided information on the amount of the commission, who paid it, or how it was calculated. From its commission, Tri-Core paid Barrett the equivalent of 40-50% of the corporate plaintiffs' first-year plan contributions and 3% of their contributions in subsequent years. Barrett, in turn, distributed a portion of his commission to co-brokers. Some of the plaintiffs were aware that Barrett received commissions, but he did not tell them how much he was paid or how his compensation was calculated.

Between 1990 and 1997, the corporate plaintiffs each made contributions to their plans totaling several hundred thousand dollars.[5] On their federal income tax returns, they deducted the contributions in full as ordinary and necessary business expenses pursuant to 26 U.S.C. § 162. In 1995, the Internal Revenue Service ("IRS") issued Notice 95-34, which concerned employer trust arrangements premised on the same scheme as EPIC. See 1995-1 C.B. 309. The Notice explained that the arrangements do not satisfy the 10-or-more-employer-plan exemption provided by § 419A(f)(6) because they call for individual plans maintained by each employer.[6] Employers, the IRS warned, should expect disallowance of deductions for contributions made to such plans. The Notice characterized EPIC-style plans as providing deferred compensation subject to taxation.

In 1997 and 1998, the IRS audited certain tax returns of each of the corporate plaintiffs. Consistent with its position in the Notice, the IRS disallowed most of their deductions.[7] Each corporate plaintiff incurred over $100,000 in fees and taxes or penalties.[8]

---

[5] The Lima Plastics plaintiffs contributed $726,001.00, the Alloy Cast plaintiffs $378,057.87, the Finderne plaintiffs $336,591.86, and the Universal Mailing plaintiffs $755,819.00.

[6] The United States Tax Court endorsed this position in Booth v. Commissioner, 108 T.C. 524, 571 (T.C. 1997).

[7] In Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43 (T.C. 2000), the United States Tax Court considered two test cases involving a tax deferral scheme that mirrored EPIC.

II.

A.

The Finderne plaintiffs and Alloy Cast plaintiffs initiated separate actions in New Jersey Superior Court against Barrett and related defendants in 1999. Asserting a number of state law claims, they alleged that Barrett's fraudulent misrepresentations about the tax benefits of the plan caused them substantial economic injury. The trial judges in those actions issued judgments for the defendants on the basis that the claims were preempted by ERISA and that federal courts retain exclusive jurisdiction over the ERISA claims. Finderne Mgmt. Co. v. Barrett, 809 A.2d 842, 847 (N.J. Super. Ct. App. Div. 2002).

The cases were consolidated on appeal and the Appellate Division of the New Jersey Superior Court reversed, holding that ERISA did not preempt the state law claims. Id. at 856. The court first determined that although the EPIC structure itself was not a multiple employer employee welfare benefit plan under ERISA, each individual employer plan did constitute an ERISA employee benefit plan. Id. at 850-51. The court nevertheless determined that ERISA did not preempt the plaintiffs' state law claims because the harm alleged — reliance on misrepresentations about the tax benefits of the EPIC model made in the course of marketing EPIC — occurred before the corporate plaintiffs established their individual ERISA plans. Id. at 855. The challenged conduct, therefore, did not "relate to" an ERISA plan. Id. (applying 29 U.S.C. § 1144(a)). Moreover, the court explained, Barrett's alleged misrepresentations that the plans would qualify for favorable tax treatment did "not impact the structure or administration of the ERISA plans;

_____

The court upheld the Commissioner's disallowance of deductions and imposition of penalties on participant corporations. We affirmed that decision. Neonatology, 299 F.3d at 233.

[8] However, the District Court found that "the effect of the IRS audit on the Finderne plaintiffs was not established at trial." App. 56 ¶ 46.

11

they [did] not relate to any state laws that regulate the type of benefits or terms of the ERISA plan; they [were] unrelated to laws creating reporting, disclosure, funding or vesting requirements or the plans; and they [did] not affect the calculation of plan benefits." Id. at 855.

On remand, the Finderne plaintiffs added a federal RICO claim which, along with a common law breach of fiduciary duty claim, was tried before a jury. The jury returned a verdict for the plaintiffs and awarded approximately $70,000 in damages. The judgment was affirmed on appeal. Finderne Mgmt. Co. v. Barrett, 955 A.2d 940 (N.J. Super. Ct. App. Div. 2008). The Alloy Cast plaintiffs' case on remand was removed to federal court and consolidated with this case.

B.

In December 2000, the plaintiffs initiated this action in the United States District Court for the District of New Jersey. The amended complaint asserted eighteen claims against seventeen defendants, but the only allegations relevant here are that Tri-Core and Barrett intentionally misrepresented or failed to disclose material information about EPIC. In general, the claims fall into three substantive theories of liability. Tri-Core and Barrett allegedly (1) misrepresented the tax risks and benefits of the plans, (2) concealed their extraction of commissions from the plaintiffs' contributions to the plans, and (3) misrepresented the ability of plan participants to access conversion credits in their premium rate stabilization funds. Against Barrett, the corporate plaintiffs asserted claims under ERISA § 502(a)(2) and (a)(3) for violations of the duties imposed by ERISA §§ 404, 405, and 406. In addition, the plaintiffs asserted five civil RICO claims under 18 U.S.C. § 1964(c), as well as nine state statutory and common law claims, including breach of fiduciary duty.

The parties filed cross motions for partial summary judgment. With respect to the Finderne plaintiffs, the District Court granted summary judgment in favor of Barrett on all claims that were or could have been asserted in the state court proceeding. What remained were the Finderne plaintiffs'

12

ERISA claims, which survived because Congress vested federal courts with exclusive jurisdiction over most ERISA claims. See 29 U.S.C. § 1132(e).

The District Court next turned to Barrett's contention that he was not a proper defendant under ERISA § 502(a)(2) and (a)(3). Barrett was not a fiduciary with respect to the plans, the court explained. In effect, this legal conclusion necessitated the grant of summary judgment to Barrett on the § 502(a)(2) claim, for that provision only provides a cause of action against ERISA fiduciaries. See 29 U.S.C. §§ 1109, 1132(a)(2); Mertens v. Hewitt Assocs., 508 U.S. 248, 252-53 (1993).[9] But Barrett's status as a nonfiduciary, the court continued, did not preclude potential liability under § 502(a)(3), for that provision permits claims for equitable relief against knowing participants in a fiduciary's breach of its fiduciary obligations under ERISA. By requesting disgorgement of Barrett's commissions, the court determined, the plaintiffs sought "appropriate equitable relief" within the meaning of § 502(a)(3). The court also rejected Barrett's argument that the ERISA claims were barred by the statute of limitations set forth in 29 U.S.C. § 1113 because no evidence revealed when the plaintiffs became aware of Tri-Core's commissions. Finding a number of remaining disputes of material fact, the court denied the plaintiffs' motion for summary judgment on the § 502(a)(3) claim.

Finally, the District Court addressed Barrett's argument that certain state law claims (asserted by the Alloy Cast, Lima Plastics, and Universal Mailing plaintiffs) were preempted by ERISA § 514(a). Reasoning that state law claims based on misrepresentations made by Barrett about tax advantages did not "relate to" the individual ERISA plans because they pre-dated the plans' formation, the court found no ERISA preemption. The court next considered state law claims concerning Barrett's alleged misrepresentations about

---

[9] Section 502(a)(2) extends a cause of action "for appropriate relief" under ERISA § 409. Section 409 makes a "fiduciary with respect to a plan" personally liable for losses caused by its breach of fiduciary obligations imposed by ERISA and permits a court to award "equitable or remedial relief" against the fiduciary. 29 U.S.C. § 1109(a).

13

conversion credits and commissions made before and after the ERISA plans were established. Because those claims "related to" alleged misconduct in the administration of the plans, the District Court held, they were preempted.

C.

The District Court bifurcated the claims into those that would be decided by a jury (the RICO and state law claims) and those that would be decided by the court in a bench trial (the ERISA claims).[10] For the sake of judicial economy, the court held one two-week trial in November and December of 2009. As a result of the summary judgment ruling and the plaintiffs' withdrawal and settlement of claims, only the ERISA, RICO, and common law breach of fiduciary duty claims against Barrett remained by the end of the trial. Consistent with the rationale of the preemption ruling, the common law breach of fiduciary duty claim concerned only Barrett's alleged pre-plan misrepresentations about EPIC's tax benefits. The ERISA claims were narrowed to Barrett's alleged participation in Tri-Core's breach of the fiduciary duties imposed by ERISA §§ 404(b) and 406(b). Over the plaintiffs' objection, the District Court instructed the jury not to consider evidence pertaining to Tri-Core and Barrett's commissions in their deliberations on the RICO claim.

The jury returned a verdict for Barrett on the RICO claim and for the plaintiffs on the common law breach of fiduciary duty claim. It awarded the plaintiffs the damages they incurred as a result of the IRS audits: $128,925 to the Alloy Cast plaintiffs, $133,415 to the Lima Plastics plaintiffs, and $176,643 to the Universal Mailing plaintiffs. Barrett promptly requested apportionment of damages between Barrett and other tortfeasors — namely, Tri-Core and Redfearn. Over the plaintiffs' objection, the court gave the instruction, and the jury determined that one half of the plaintiffs' loss was attributable to Tri-Core and Redfearn.

---

[10] Because ERISA § 502(a)(3) authorizes only "equitable relief," no right to a jury trial attaches under the Seventh Amendment to the United States Constitution. Cox v. Keystone Carbon Co., 861 F.2d 390, 393 (3d Cir. 1988).

14

That determination halved the damages recoverable from Barrett.

The parties filed several post-trial motions. In a series of decisions, the court granted Barrett's motion for judgment as a matter of law on the plaintiffs' demand for punitive damages; denied the plaintiffs' motion for a new trial on their civil RICO claims; and denied the plaintiffs' motion for judgment as a matter of law with respect to the jury's apportionment of damages.

Some time later, the court issued its findings of fact and conclusions of law with respect to the ERISA claims. As had been established by the summary judgment ruling, the claims only concerned misrepresentations made with respect to commissions and the accessibility of conversion credits, both of which occurred after the establishment of the plans. The court reiterated that while the EPIC framework was not a "multiple employer" welfare benefit plan within the meaning of ERISA § 3(40), each individual plan at issue in this case was covered by ERISA as a "single-employer plan," as defined by ERISA § 3(41). See 29 U.S.C. § 1002(40), (41).

Turning to the status of the defendants, the District Court reaffirmed that Tri-Core was a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), but Barrett was not. The court determined that Barrett nevertheless could be held accountable under § 502(a)(3) if he knowingly participated in Tri-Core's violation of substantive ERISA provisions. The District Court next ruled that Tri-Core breached its fiduciary obligations imposed by ERISA § 406(b)(3), but not §§ 406(b)(1) or 404. Taking the § 404 claim first, it explained that Tri-Core did not misrepresent the accessibility of conversion credits in the reserve fund because the plan documents clearly stated that no employee was entitled to employer contributions. Nor did Tri-Core misappropriate plan assets for its own account, an act that would have violated § 406(b)(1), because Tri-Core was no longer a fiduciary when Commonwealth paid its commissions and Commonwealth did not pay its commissions out of plan assets. Regarding the plaintiffs' theory that Tri-Core received excessive compensation, the court explained that the only relevant testimony in the record confirmed that the compensation was reasonable under industry norms. Finally,

15

to the extent that § 404 imposed a duty on Tri-Core to disclose the fact and amount of its commissions, the court found that any nondisclosure did not harm the plaintiffs because the plans provided guaranteed benefits.

Tri-Core's receipt of commissions from Commonwealth, however, did run afoul of § 406(b)(3), according to the District Court. Section 406(b)(3), ERISA's anti-kickback provision, bars a fiduciary from receiving consideration in connection with a transaction involving plan assets. 29 U.S.C. § 1106(b)(3). The District Court found that Tri-Core promoted Commonwealth's policies as investment vehicles for the plans knowing that it would draw a handsome salary from Commonwealth on each C-group policy it sold. This gave Tri-Core an incentive to recommend that the plaintiffs choose C-group policies as plan assets. Indeed, EPIC depended on funding the plans with C-group policies. Section 406(b)(3), the court concluded, forbids this sort of symbiotic relationship between a plan fiduciary and an institution offering funding vehicles for the plan.

The reasonableness of Tri-Core's commissions, the court next determined, was no defense. Whether or not Tri-Core's commissions were reasonable, § 406(b)(3) erects a categorical bar to such compensation. The court found that an abundance of evidence established that Barrett knew about and actively assisted in Tri-Core's violation of § 406(b)(3). Accordingly, the court concluded that Barrett was liable under § 502(a)(3) for his knowing participation in Tri-Core's § 406(b)(3) violation, and it issued judgment for the plaintiffs on that claim.

Disgorgement of one-half of the commissions Barrett received in connection with his sale of EPIC to plaintiffs, the District Court determined, would most equitably remediate their injuries.[11] Exercising its discretion, the court applied a

---

[11] The court ordered Barrett to disgorge $15,508.97 to the Finderne plaintiffs, $41,634.35 to the Lima Plastics plaintiffs, $38,657.08 to the Alloy Cast plaintiffs, and $16,657.61 to the Universal Mailing plaintiffs.

prejudgment interest rate of 3.91%[12] and declined to award the plaintiffs attorneys' fees and costs.

Both parties moved to amend the judgment. The District Court granted in part and denied in part the motions. Reversing its prior ruling, it held the Alloy Cast and Universal Mailing plaintiffs' ERISA claims were time-barred in light of evidence establishing their awareness, dating to 1990, of Tri-Core's § 406(b)(3) violation. The parties' remaining contentions, the court concluded, had already been resolved or were otherwise meritless. The plaintiffs timely appealed and Barrett cross appealed.

III.

We have subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1367 and 29 U.S.C. § 1132(e). Our appellate jurisdiction is based on 28 U.S.C. § 1291.

"We exercise plenary review over a district court's summary judgment ruling." Disabled in Action of Pa. v. Se. Pa. Transp. Auth., 635 F.3d 87, 92 (3d Cir. 2011) (quotation marks omitted). "Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Id. In an appeal from an ERISA bench trial, we review the District Court's findings of fact for clear error and its conclusions of law de novo. Vitale v. Latrobe Area Hosp., 420 F.3d 278, 281 (3d Cir. 2005).

IV.

Congress enacted ERISA "to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years." Boggs v. Boggs, 520 U.S. 833,

---

[12] The court borrowed the rate from that set forth in 28 U.S.C. § 1961. Its calculus resulted in $29,114.72 for the Finderne plaintiffs, $81,941.41 for the Lima Plastics plaintiffs, $76,329.75 for the Alloy Cast plaintiffs, and $29,458.71 for the Universal Mailing plaintiffs.

17

839 (1997). Crafted to bring order and accountability to a system of employee benefit plans plagued by mismanagement, see Massachusetts v. Morash, 490 U.S. 107, 112 (1989), ERISA is principally concerned with protecting the financial security of plan participants and beneficiaries. 29 U.S.C. § 1001(b); Boggs, 520 U.S. at 845; Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983). To this end, the statute sets forth detailed disclosure and reporting obligations for plans and imposes various participation, vesting, and funding requirements. See 29 U.S.C. §§ 1021-1086; Morash, 490 U.S. at 113.

Relevant here, ERISA also prescribes standards of conduct for plan fiduciaries, derived in large part from the common law of trusts. 29 U.S.C. §§ 1101-1114; Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989). Section 404 requires fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity" would use. 29 U.S.C. § 1104(a)(1). Supplementing that foundational obligation is § 406, which prohibits plan fiduciaries from entering into certain transactions. Id. § 1106. Subsection (a) erects a categorical bar to transactions between the plan and a "party in interest" deemed likely to injure the plan. Id. § 1106(a); Reich v. Compton, 57 F.3d 270, 275 (3d Cir. 1995).[13] Subsection (b) prohibits fiduciaries from entering into transactions with the plan tainted by conflict-of-interest and self-dealing concerns. 29 U.S.C. § 1106(b); Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1213 (2d Cir. 1987). Section 408 offsets § 406 by creating exemptions from liability on certain transactions that would otherwise be prohibited. 29 U.S.C. § 1108.

ERISA also aims "to provide a uniform regulatory regime over employee benefit plans" in order to ease administrative burdens and reduce employers' costs. Aetna

---

[13] ERISA defines "party in interest" to include nine classes of individuals or entities, 29 U.S.C. § 1002(14), but the general concept "encompass[es] those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 242 (2000).

18

Health Inc. v. Davila, 542 U.S. 200, 208 (2004). To ensure that plan regulation resides exclusively in the federal domain, Congress inserted in the statute an expansive preemption provision, codified at § 514(a). See 29 U.S.C. § 1144(a); Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981). Congress paired § 514(a) with § 502(a), which enumerates a set of integrated civil enforcement remedies designed to redress violations of the statute or the terms of a plan. See 29 U.S.C. § 1132(a).

All of these aspects of ERISA are at issue in this case. In the sections that follow, we address the plaintiffs' objections to the District Court's ruling on preemption, the amenability of Barrett to suit under ERISA for his participation in a violation of Tri-Core's fiduciary obligations, and the availability of various statutory defenses to liability. We also examine the District Court's application of ERISA's statute of limitations and its award of equitable relief in favor of the plaintiffs.

### A.

We begin with the plaintiffs' challenge to the grant of partial summary judgment in favor of Barrett on the basis that ERISA preempts a subset of the state law claims.[14] The complaint alleged that Barrett induced the plaintiffs to participate in EPIC by misrepresenting the tax advantages of the plans, the accessibility of conversion credits, the presence of a reserve fund, and the nature of the commissions he and Tri-Core anticipated earning. It also alleged that Barrett encouraged the plaintiffs' ongoing participation in EPIC after the plans' adoption by continuing to misrepresent the accessibility of conversion credits within a reserve fund and by concealing information about the commissions he and Tri-Core earned. Insofar as the claims of fraud, breach of fiduciary duty, breach of contract, breach of the implied duty of good faith and fair dealing, and conspiracy/aiding and abetting pertained to alleged misrepresentations about commissions, the accessibility of conversion credits, and the

---

[14] We exercise plenary review over the legal question of ERISA preemption. Barber v. UNUM Life Ins. Co. of Am., 383 F.3d 134, 138 n.5 (3d Cir. 2004).

19

presence of a reserve fund, the District Court deemed them preempted.

ERISA possesses "extraordinary pre-emptive power." Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 65 (1987). Its broad preemptive scope reflects Congress's intent to lodge regulation of employee benefit plans firmly in the federal domain. N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656-57 (1995). Consolidation of regulation and decisionmaking with respect to covered plans in the federal sphere, Congress anticipated, would promote uniform administration of benefit plans and avoid subjecting regulated entities to conflicting sources of substantive law. Id. at 657. This, in turn, would "minimize the administrative and financial burden" imposed on regulated entities, Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990), and expand employers' provision of benefits in light of the more predictable set of liabilities, Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 379 (2002). What emerged from Congress's deliberations on ERISA was a statute that both preempts state law expressly and contains a comprehensive civil enforcement scheme that preempts any conflicting state remedy. Ingersoll-Rand, 498 U.S. at 138-45; Barber, 383 F.3d at 138-41.[15]

The District Court focused on express rather than conflict preemption, so we will begin by considering whether the District Court properly found the plaintiffs' state law causes of action expressly preempted. Section 514(a) provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]" 29 U.S.C. § 1144(a). A "State law" under the statute includes "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." Id. § 1144(c)(1). State common law claims fall within this

---

[15] Under the conflict preemption analysis, "any state law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." Davila, 542 U.S. at 209 (citing Ingersoll-Rand, 498 U.S. at 143-45; Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54-56 (1987)).

definition and, therefore, are subject to ERISA preemption. See, e.g., Ingersoll-Rand, 498 U.S. at 140; Pilot Life Ins. Co v. Dedeaux, 481 U.S. 41, 48 (1987).

The term "relate to" in § 514(a) is "deliberately expansive." Ingersoll-Rand, 498 U.S. at 138; Pilot Life, 481 U.S. at 46. Nevertheless, the Supreme Court cautions, its broad scope cannot "extend to the furthest stretch of its indeterminacy"; otherwise, "for all practical purposes preemption would never run its course." Travelers, 514 U.S. at 655. The test for whether a state law cause of action "relate[s] to" an employee benefit plan is whether "'it has a connection with or reference to such a plan.'" Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 147 (2001) (quoting Shaw, 463 U.S. at 97). The "connection with" component of this test, however, supplies scarcely more content than the "relate to" formulation. So, in applying the test, we must also look to "'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans." Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 325 (1997) (quoting Travelers, 514 U.S. at 658-59).

We are satisfied that the District Court correctly held the plaintiffs' common law claims were preempted to the extent they relate to Barrett's alleged misrepresentations, made after the plans' adoption, about commissions and the accessibility of conversion credits within a purported reserve fund.[16] Those claims have "a connection with" the ERISA plans because they are premised on the existence of the plans. See Ingersoll-Rand, 498 U.S. at 140 (finding that a common law claim for wrongful discharge "relates to" an ERISA plan because the cause of action "is premised on[] the existence of a pension plan"). To prevail on those claims, the plaintiffs would have had to plead, and the court to find, that the plans were in fact adopted. The court would then be called on to assess Barrett's representations in light of the plaintiffs' benefits and rights under the plans. This type of analysis —

---

[16] The plaintiffs do not contend that any of the claims survive by virtue of the insurance savings clause in § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A).

21

concerning the accuracy of statements made by an alleged (state law) fiduciary to plan participants in the course of administering the plans — sits within the heartland of ERISA. See, e.g., Kollman v. Hewitt Assocs., LLC, 487 F.3d 139, 149–50 (3d Cir. 2007) (reasoning that the calculation and payment of a benefit due to a plan participant goes to the essential function of an ERISA plan). We therefore conclude that the plaintiffs' common law claims are preempted to the extent they relate to Barrett's conduct after he enrolled the plaintiffs in EPIC.

We are left, then, with the plaintiffs' common law claims concerning Barrett's representations about the presence of a reserve fund, the accessibility of conversion credits, and the nature of his commissions made before the establishment of the plans.[17] Those representations, plaintiffs allege, induced them to participate in EPIC. Whether or not claims touching on those alleged misrepresentations are preempted requires us to confront the following question: do common law claims that an insurance agent misrepresented the structure and benefits afforded by an ERISA plan in order to induce participation in that plan "ha[ve] a connection with" the plan, such that they are preempted?

In answering this question, we are not without guidance. Several Courts of Appeals have held that an insurance agent who makes fraudulent or misleading statements to induce participation in an ERISA plan is amenable to suit under state law theories of recovery. See, e.g., Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 991-92 (10th Cir. 1999) (holding the plaintiffs' fraudulent inducement claims not preempted because the actions had occurred before the defendant had become a fiduciary); Wilson v. Zoellner, 114 F.3d 713, 721 (8th Cir. 1997) (finding that a state law claim of negligent misrepresentation was not preempted because allowing the plaintiff to recover for pre-plan tortious conduct would not prevent plan administrators from carrying out their duties and would not impose new duties on plan administrators); Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1472 (4th Cir. 1996)

---

[17] Neither Barrett nor the plaintiffs question the District Court's finding that the claims concerning Barrett's pre-plan promises of tax advantages were not preempted.

22

(finding a state law claim of professional negligence not preempted because "the court's inquiry will be centered on whether the defendants' conduct comported with the relevant professional standard"); accord Morstein v. Nat'l Ins. Servs, Inc., 93 F.3d 715 (11th Cir. 1996); Perkins v. Time Ins. Co., 898 F.2d 470 (5th Cir. 1990). Displacing claims of this variety, these courts reason, "would not further Congress' purpose in passing ERISA." Woodworkers, 170 F.3d at 991 (citing Coyne & Delany Co., 98 F.3d at 1466-71). We agree. "Holding insurers accountable for pre-plan fraud does not affect the administration or calculation of benefits, nor does it alter the required duties of plan fiduciaries." Id. (citing Wilson, 114 F.3d at 719; Coyne & Delaney Co., 98 F.3d at 1471). A state's common law, generally intended to "prevent sellers of goods and services, including benefit plans, from misrepresenting . . . the scope of their services," is "'quite remote from the areas with which ERISA is expressly concerned — reporting, disclosure, fiduciary responsibility, and the like.'" Wilson, 114 F.3d at 720 (quoting Dillingham, 519 U.S. at 330).

In our view, these sorts of claims rest on misrepresentations made about an ERISA plan before that plan's existence. They are not premised on a challenge to the actual administration of the plan. To the extent that a reviewing court would need to examine the provisions of the plan in considering the claims, it would be only to determine whether the representations made by Barrett regarding plan structure and benefits were at odds with the plan itself, or with the plaintiffs' understanding of the benefits afforded by the plans. This is not the sort of exacting, tedious, or duplicative inquiry that the preemption doctrine is intended to bar. To the contrary, that comparison requires only a cursory examination of the plan provisions and turns largely on "legal duties generated outside the ERISA context." Coyne & Delany Co., 98 F.3d at 1472. Nor do we think these claims strike at that area of core ERISA concern — "funding, benefits, reporting, and administration" — in which the use of state, rather than federal, law threatens to undermine the goals of Congress in enacting ERISA in the first place. See Kollman, 487 F.3d at 149.

Accordingly, we conclude that ERISA does not preempt the plaintiffs' state law claims to the extent they allege that Barrett misrepresented the existence of a reserve fund, the availability of conversion credits, and the nature of his commissions before adoption of the EPIC plans. To the extent it granted partial summary judgment in favor of Barrett on those theories of recovery, we will vacate the District Court's ruling and remand for further proceedings. Retrial on these claims may be necessary. However, the District Court may, on remand, consider other arguments pressed by the parties in dispositive motions or consider, among other issues, whether retrial on those claims would result in double recovery for a single injury. We express no view on these matters.

## B.

We turn next to Barrett's cross appeal, which challenges the District Court's threshold determination that Barrett is amenable to suit under ERISA § 502(a)(3) as a nonfiduciary who knowingly participated with Tri-Core in transactions forbidden by § 406(b)(3). Section 406(b)(3) prohibits a fiduciary from "receiv[ing] any consideration for his own personal account from any party dealing with [an ERISA plan] in connection with a transaction involving assets of the plan." 29 U.S.C. § 1106(b)(3).[18] Section 502(a)(3)

---

[18] Section 406(b) provides in full:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with

24

authorizes a civil action by "a participant, beneficiary, or fiduciary" of an ERISA plan "to obtain . . . appropriate equitable relief (i) to redress . . . violations [of Title I of ERISA or the plan] or (ii) to enforce any provisions of [Title I of ERISA] or the terms of the plan[.]"  29 U.S.C. § 1132(a)(3).[19]  The plaintiffs' theory was that § 502(a)(3) enabled them to seek restitution from Barrett for an "act or practice" that injured them — namely, Tri-Core's receipt of commissions from Commonwealth in connection with transactions involving plan assets.  Accepting the premise, the District Court deemed Barrett a proper defendant under § 502(a)(3) as construed by the Supreme Court in Harris Trust

---

> such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

[19] In relevant part, § 502(a) provides:

> A civil action may be brought—
>
>         . . . .
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;
>
>         . . . .
>
> (5) except as otherwise provided in subsection (b) of this section, by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter[.]

29 U.S.C. § 1132(a).

25

& Savings Bank v. Salomon Smith Barney, Inc., 530 U.S. 238 (2000).  Barrett maintains that a recent decision of this Court, Renfro v. Unisys Corp., 671 F.3d 314 (3d Cir. 2011), clarifies that he cannot be held accountable under § 502(a)(3) because he is not a fiduciary or a party in interest to a transaction prohibited by ERISA § 406(a).[20]  To weigh these

---

[20] Section 406(a) provides in full:

> Except as provided in section 1108 of this title:
>
>> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>>
>>> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>>> (B) lending of money or other extension of credit between the plan and a party in interest;
>>> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
>>> (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or
>>> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.
>>
>> (2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

29 U.S.C. § 1106(a).

26

competing positions, we must first step back and recount the pertinent cases construing § 502(a)(3).

1.

The Supreme Court first had occasion to construe § 502(a)(3) in Mertens v. Hewitt Associates, 508 U.S. 248 (1993). That suit arose out of the Kaiser Steel Corporation's inadequate funding of its ERISA-governed pension plan, resulting in termination of the plan and diminished payouts for beneficiaries. Id. at 250. A putative class of former Kaiser employees brought suit under § 502(a)(3) against Kaiser and Hewitt Associates, a nonfiduciary actuary whose acts and omissions allegedly caused Kaiser to miscalculate its funding obligations. The plaintiffs sought equitable relief and money damages from Hewitt for its active participation in the plan fiduciaries' breach of legal duties. Id. The Supreme Court agreed to consider "whether ERISA authorizes suits for money damages against nonfiduciaries who knowingly participate in a fiduciary's breach of fiduciary duty." Id. at 251.

Within this question, the Court recognized, are two distinct issues. The antecedent issue is whether a § 502(a)(3) claim may be asserted against a nonfiduciary that knowingly participates in a fiduciary's breach of fiduciary duty. The secondary issue concerns the availability of money damages. Because the parties' briefs were directed primarily to the second question, the Court resolved only that issue, holding that "appropriate equitable relief" under § 502(a)(3) does not encompass suits seeking compensatory damages from nonfiduciaries. Id. at 254-55.

Although it "reserve[d] decision of th[e] antecedent question," the Court took the opportunity to make some brief comments. Id. at 255. While certain ERISA provisions like § 406(a) may by their plain text impose duties on nonfiduciaries, the Court observed, "no provision explicitly requires them to avoid participation (knowing or unknowing) in a fiduciary's breach of fiduciary duty." Id. at 254 & n.4. By contrast, the Court noted, ERISA § 405(a), the cofiduciary provision, "*does* explicitly impose 'knowing participation' liability on cofiduciaries." Id. (emphasis in original) (citing

27

29 U.S.C. § 1105(a)). In effect, the Court's dicta hitched defendant status in a § 502(a)(3) suit to the scope of ERISA's substantive provisions. In so doing, it cast doubt upon the viability of suits proceeding on the theory that § 502(a)(3) provides a remedy for a nonfiduciary's knowing participation in a fiduciary's breach of a duty imposed by ERISA.

We employed Mertens's dicta in Reich v. Compton, a case concerning a series of questionable transactions undertaken by an ERISA-governed union pension plan. 57 F.3d at 272. The Secretary of the Department of Labor sued the fiduciaries of the plan for breach of the duties imposed by ERISA §§ 404(a), 406(a), and 406(b). The Secretary also asserted claims against two nonfiduciaries, alleging that they had knowingly participated in the fiduciaries' violations of their obligations under ERISA. Compton, 57 F.3d at 273-74. The Secretary's cause of action against the nonfiduciaries arose under § 502(a)(5). Id. at 281. That provision replicates the language of § 502(a)(3) in all relevant respects, with the exception that it extends a cause of action to the Secretary instead of a participant, beneficiary, or fiduciary of the plan. Compare 29 U.S.C. § 1132(a)(3), with id. § 1132(a)(5).[21]

The Secretary advanced two theories in support of his claims against the nonfiduciaries: "first, that section 502(a)(5) authorizes him to sue nonfiduciaries who knowingly participate in breaches of fiduciary duty by fiduciaries and second, that section 502(a)(5) authorizes him to sue nonfiduciaries who participate in transactions prohibited by section 406(a)(1)." Compton, 57 F.3d at 281. Taking the theories in turn, we first rejected the Secretary's argument that § 502(a)(5) permits actions against nonfiduciaries charged solely with participating in a fiduciary breach. Id. at 284. Three decisions informed our analysis. First, because § 502(a)(5) mirrors § 502(a)(3), we relied heavily on the dicta in Mertens addressing the scope of § 502(a)(3). Id. at 282. We explained that "the Court expressed considerable doubt that section 502(a)(3) authorizes suits against nonfiduciaries who participate in

---

[21] The Supreme Court instructs that the overlapping language in the two provisions "should be deemed to have the same meaning." Mertens, 508 U.S. at 260.

fiduciary breaches." Id. To the Secretary's contention that the plain language of § 502(a)(5) embraces a claim against a nonfiduciary to redress a fiduciary's breach of ERISA, we pointed out that the Courts of Appeals for the First and Seventh Circuits had already rejected that argument. Id. at 283-84 (citing Reich v. Continental Cas. Co., 33 F.3d 754 (7th Cir. 1994); Reich v. Rowe, 20 F.3d 25 (1st Cir. 1994)). Both Courts of Appeals, we observed, found the Mertens dicta convincing. Id.; see also Continental Cas. Co., 33 F.3d at 757; Rowe, 20 F.3d at 29-31. We did not undertake an independent analysis of the statutory language, but rather rooted our holding in the reasoning of our sister Courts of Appeals and of the Supreme Court in Mertens. Compton, 57 F.3d at 284.

The Secretary's second theory, which narrowly focused on the alleged breach of § 406(a), fared better. Section 406(a) disallows certain transactions between fiduciaries and parties in interest deemed likely to injure plan participants and beneficiaries. 29 U.S.C. § 1106(a); Harris Trust, 530 U.S. at 241-42. We agreed with the Secretary that "a nonfiduciary that is a party to a transaction prohibited by section 406(a)(1) engages in an 'act or practice' that violates ERISA" and may be subject to suit under § 502(a)(5). Compton, 57 F.3d at 287. While acknowledging that § 406(a)(1) on its face imposes a duty only on fiduciaries, we nevertheless credited the Supreme Court's suggestion in Mertens that the statute also imposes obligations on nonfiduciary "part[ies] in interest" who participate in proscribed transactions. Id. at 285 (citing Mertens, 508 U.S. at 253-54 & n.4). Put another way, the "party in interest" language in § 406(a)(1), rather than any language in § 502(a)(5), supplied the textual hook for our conclusion that the nonfiduciaries were amenable to suit. See id. Our analysis comported with that of the Courts of Appeals for the First and Ninth Circuits, which likewise construed § 406(a)(1) to apply to nonfiduciaries. Id. at 285-86 (citing Rowe, 20 F.3d at 31 & n.7; Nieto v. Ecker, 845 F.2d 868, 873-74 (9th Cir. 1988)).

Five years later, the Supreme Court decided Harris Trust. The question in that case was whether § 502(a)(3) authorizes a participant, beneficiary, or fiduciary of an

ERISA plan to seek equitable relief from a nonfiduciary party in interest to a transaction prohibited by § 406(a)(1). Harris Trust, 530 U.S. at 241. That is, the Court in Harris Trust considered the second question addressed in Compton, with the inconsequential distinction that the suit arose under § 502(a)(3) rather than § 502(a)(5). Like this Court in Compton, the Supreme Court answered that question in the affirmative. Id. Notable for our purposes here was the reasoning employed by the unanimous Court, which diverged from Compton in important respects.

The case arose when the trustee of a pension plan alleged that another fiduciary purchased worthless interests in motel properties from a party in interest. Id. at 242-43. If proven, the transaction would have been a violation of § 406(a). The nonfiduciary seller of the interest in the motel properties persuaded the Court of Appeals for the Seventh Circuit that § 502(a)(3) does not authorize a plan fiduciary to seek equitable relief from a party in interest to a transaction prohibited by § 406(a). Id. at 244.

The Supreme Court began its analysis with the observation that, by its terms, § 406(a) "imposes a duty only on the fiduciary that causes the plan to engage in the transaction." Id. at 245 (citing 29 U.S.C. § 1106(a)(1)). This construction undercut one basis for our extension in Compton of § 502(a)(5) liability to a party in interest to a § 406(a) transaction: the Supreme Court implicitly rejected its suggestion in Mertens that the text of § 406(a) anticipates liability for nonfiduciary parties in interest to § 406(a) transactions.

Moving beyond § 406(a), the Court next explained that § 502(a)(3), standing alone, imposes certain duties. Id. Liability under § 502(a)(3), the Court emphasized, "does not depend on whether ERISA's substantive provisions impose a specific duty on the party being sued." Id. Rather, "defendant status under § 502(a)(3) may arise from duties imposed by § 502(a)(3) itself." Id. at 247. Unlike other ERISA rights of action, § 502(a)(3) "admits of no limit . . . on the universe of possible defendants." Id. at 246. Its focus "is on redressing the '*act or practice* which violates any provision of [ERISA Title I].'" Id. (quoting 29 U.S.C. §

30

1132(a)(3)) (emphasis in original). By carefully delineating three classes of plaintiffs but leaving defendant status open-ended, the Court explained, § 502(a)(3) signals Congress's intent not to delimit categories of defendants subject to § 502(a)(3) liability. Id. at 247. Instructive, too, was the common law of trusts, which had long countenanced suits for restitution or disgorgement against third parties who knowingly took trust property from a trustee in breach of the trustee's fiduciary duty. Id. at 250.

Confirming the Court's interpretation was ERISA § 502(*l*), which requires the Secretary of Labor to "assess a civil penalty against an 'other person' who 'knowing[ly] participat[es] in' ' any . . . violation of . . . part 4 [of ERISA Title I] . . . by a fiduciary." Id. at 248 (paraphrasing 29 U.S.C. § 1132(*l*)(1)-(2)) (alteration in original).[22] The civil

---

[22] Section 502(*l*) provides in relevant part:

> (1) In the case of—
>
> > (A) any breach of fiduciary responsibility under (or other violation of) part 4 of this subtitle by a fiduciary, or
> >
> > (B) any knowing participation in such a breach or violation by any other person,
>
> the Secretary shall assess a civil penalty against such fiduciary or other person in an amount equal to 20 percent of the applicable recovery amount.
>
> > (2) For purposes of paragraph (1), the term "applicable recovery amount" means any amount which is recovered from a fiduciary or other person with respect to a breach or violation described in paragraph (1)—
> >
> > > (A) pursuant to any settlement agreement with the Secretary, or
> > >
> > > (B) ordered by a court to be paid by such fiduciary or other person to a plan or its participants and beneficiaries in a judicial

31

penalties recoverable under § 502(*l*) are defined by reference to amounts recoverable by the Secretary in § 502(a)(5) actions. Id. That reference led the Court to conclude that § 502(a)(5) must authorize suits against any "other person" who "knowing[ly] participat[es]" in a fiduciary's violation of her duties, "notwithstanding the absence of any ERISA provision explicitly imposing a duty upon an 'other person' not to engage in such 'knowing participation.'" Id. And if the action was available under § 502(a)(5), it must also be available under § 502(a)(3). Id. at 248-49. Section "502(a)(3) (or (a)(5)) liability," the Court concluded, does not "hinge[] on whether the particular defendant labors under a duty expressly imposed by the substantive provisions of ERISA Title I." Id. at 249.

Finally, the Court turned to reconcile this construction with Mertens. The Court first rejected the implication in Mertens that an "other person" under § 502(*l*) might be limited to cofiduciaries, who are expressly made liable by § 405(a) for knowing participation in another fiduciary's breach of duty. Id. at 249 (citing Mertens, 508 U.S. at 261). Congress, the Court noted, defined "person" in ERISA without regard to status as fiduciary, cofiduciary, or party in interest. Id. (citing 29 U.S.C. § 1002(9)). And, while a cofiduciary is a type of fiduciary, § 502(*l*) "clearly distinguishes between 'fiduciary' . . . and an 'other person.'" Id. (citing 29 U.S.C. § 1132(*l*)(1)(A) and (B)). The Court dismissed as "dictum" the portions of Mertens discussing § 502(*l*) and the portion relied on by the courts in Compton, Rowe, and Continental Casualty Company to cast doubt on liability of nonfiduciaries under § 502(a)(3). Id. (citing Mertens, 508 U.S. at 255, 260-61).

Several Courts of Appeals have considered whether the Court's holding in Harris Trust applies only to alleged violations of § 406(a) or whether it sweeps more broadly. Without exception, they have concluded that the Harris Trust

---

proceeding instituted by the Secretary under subsection (a)(2) or (a)(5) of this section.

29 U.S.C. § 1132(*l*).

reasoning is not tethered to the limitations of § 406(a). See Longaberger Co. v. Kolt, 586 F.3d 459, 468 n.7 (6th Cir. 2009); Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough, 354 F.3d 348, 353-54 (5th Cir. 2003); Carlson v. Principal Fin. Grp., 320 F.3d 301, 308 (2d Cir. 2003); McDannold v. Star Bank, N.A., 261 F.3d 478, 486 (6th Cir. 2001). More to the point, the Courts of Appeals for the Fifth and Sixth Circuits have stated directly that nonfiduciaries who are not parties in interest are proper defendants under § 502(a)(3) as construed by Harris Trust. Kolt, 586 F.3d at 468 n.7; Bombardier, 354 F.3d at 353-54.

2.

We turn now to consider whether Barrett is amenable to suit under § 502(a)(3) in view of the Supreme Court's reasoning in Harris Trust. Barrett, we have noted, was found liable for his knowing participation in transactions forbidden by § 406(b)(3), which prohibits a "fiduciary with respect to a plan" from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). Several matters are not in dispute. By accepting a salary from Commonwealth (a party dealing with the plans) in connection with its investment of plan assets in insurance policies issued by Commonwealth, the parties agree, Tri-Core (as fiduciary) contravened § 406(b)(3).[23] Nor is there a dispute on appeal that Barrett,

_____

[23] Barrett does contend that because the plaintiffs selected the insurance policy for each employee — either a C-group or MG-5 policy — Tri-Core did not engage with Commonwealth in a transaction prohibited by § 406(b)(3). The argument is premised on a single unreported decision of this Court that involved the relationship between an insurance company and participants in a different EPIC plan. See Faulman v. Sec. Mut. Fin. Life Ins. Co., 353 F. App'x 699 (3d Cir. 2009). That situation is obviously distinct from the basis of liability in this case: the relationship between a corporate fiduciary and an insurance company. In any event, Barrett's argument finds no support in the text of § 406(b)(3) or in controlling precedent. Whether or not the plaintiffs chose one of the two policies designated by Tri-Core as their

acting as a nonfiduciary, had knowledge of all of the circumstances surrounding Tri-Core's receipt of commissions from Commonwealth and participated in the transactions. The parties also agree that the plaintiffs have standing to bring the § 502(a)(3) claim and that their requested remedy is equitable in nature.

The parties' consensus on these issues leaves us to consider only one narrow legal question: is Barrett, a nonfiduciary who knowingly participated in a transaction prohibited by § 406(b)(3), amenable to suit under § 502(a)(3)? We hold that he is. Tri-Core's receipt of compensation from Commonwealth in connection with its directed purchase of plan assets from Commonwealth was an act or practice prohibited by ERISA. Operating in concert with Tri-Core, Barrett actively facilitated that act or practice. As the Court in Harris Trust explained, § 502(a)(3) provides a right of action against a transferee of ill-gotten trust assets who is a knowing participant in an ERISA violation. 530 U.S. at 251. It is of no consequence that Barrett was not a fiduciary and that his receipt of commissions was not itself a statutory violation, because liability under § 502(a)(3) "does not depend on whether ERISA's substantive provisions impose a specific duty on the party being sued." Id. at 245. As construed by the Court in Harris Trust, § 502(a)(3) provides the plaintiffs a cause of action to obtain equitable relief from Barrett for his knowing participation in Tri-Core's § 406(b)(3) violation. Id. at 245, 247, 250-51.

Barrett counters that our recent decision in Renfro undercuts this straightforward application of Harris Trust. In Renfro, a putative class of participants in a 401(k) plan brought suit under § 502(a)(3) against Fidelity Management Trust Company, the manager and administrator of certain funds in the plan. 671 F.3d at 317-19. They alleged that Fidelity's mismanagement of the plan's investment options amounted to a breach of the fiduciary duties of diligence and prudence imposed by ERISA § 404(a). Fidelity moved to

plan funding vehicles has no bearing on the propriety of Tri-Core's receipt of compensation from Commonwealth in connection with its directed purchase of plan assets from Commonwealth.

34

dismiss on the basis that it was not a fiduciary with respect to the challenged conduct. Both the District Court and this Court agreed. Id. at 323. But that did not end the inquiry, because the plaintiffs contended that even if Fidelity was a nonfiduciary, it was amenable to suit under § 502(a)(3) for its knowing participation in the plan fiduciary's breach of fiduciary duty under § 404(a). We disagreed, holding that § 502(a)(3) "does not authorize suit against 'nonfiduciaries charged solely with participating in a fiduciary breach.'" Id. at 325 (quoting Compton, 57 F.3d at 284). In arriving at that conclusion, we relied on the Mertens dicta and the portion of Compton finding no § 502(a)(5) cause of action against "'nonfiduciaries charged solely with participating in a fiduciary breach.'" Id. (quoting Compton, 57 F.3d at 284). In a brief footnote, we asserted that this reasoning accorded with Harris Trust. Id. at 325 n.6. We characterized Harris Trust as consonant with our holding in Compton that § 502(a)(3) "authorized suits for nonfiduciary participation by parties in interest to transactions prohibited under ERISA." Id. at 325 n.6. So framed, § 502(a)(3) did not supply a cause of action against Fidelity because the "plaintiffs d[id] not appear to contend the Fidelity entities were parties in interest to a prohibited transaction." Id.

Barrett urges us to read Renfro as establishing a firm rule that a nonfiduciary may only be subjected to suit under § 502(a)(3) if she knowingly participates as a party in interest in a § 406(a) transaction. We do not think this expansive reading of Renfro is compatible with Harris Trust. As an initial matter, Renfro was a § 404 breach of fiduciary duty case, not a § 406 prohibited transaction case, and the provisions safeguard the rights of plan participants and beneficiaries in distinct ways. Section 404 codifies the fiduciary's "general duty of loyalty to the plan's beneficiaries." Harris Trust, 530 U.S. at 241-42. It springs from the common law of trusts, which likewise charged fiduciaries with a duty of loyalty. See Pegram v. Herdrich, 530 U.S. 211, 224 (2000) (citing 2A A. Scott & W. Fratcher, Trusts § 170, p. 311 (4th ed.1987)). Section 406(b)(3), at issue in this case, is among the prophylactic rules listed in § 406. Section 406(a) "categorically bar[s] certain transactions deemed 'likely to injure the . . . plan.'" Harris Trust, 530 U.S. at 242 (quoting Comm'r v. Keystone Consol. Indus.,

35

Inc., 508 U.S. 152, 160 (1993)). And § 406(b) categorically bars certain transactions likely to generate self-dealing, a practice detrimental to plan participants and beneficiaries. Compton, 57 F.3d at 287. Both provisions "appl[y] regardless of whether the transaction is 'fair' to the plan." Id. at 288.

The congruity of the prohibited transaction provisions leaves no logical basis for distinguishing between nonfiduciaries' knowing participation in § 406(b) transactions and nonfiduciaries' knowing participation in § 406(a) transactions. Accord LeBlanc v. Cahill, 153 F.3d 134, 153 (4th Cir. 1998) (finding no reason why, in a § 502(a)(3) action, "allowing equitable relief to be obtained from nonfiduciary parties in interest who participated in a transaction prohibited under ERISA § 406(a)(1) would be any different if the transaction were prohibited under ERISA § 406(b)(2) or § 406(b)(3)"). Harris Trust, a § 406(a) case, is the controlling precedent here; this Court's reasoning in Renfro is inapt for § 406(b) transactions. Our narrow holding in Renfro, applying to "nonfiduciaries charged solely with participating in a fiduciary breach," see 671 F.3d at 325, is limited in scope to nonfiduciaries who knowingly participate in a § 404 breach of fiduciary duty.

We have still a more fundamental disagreement with Barrett's position. His interpretation of Harris Trust and Renfro hinges on the "party in interest" language in § 406(a). That textual hook, the argument goes, justified the Supreme Court's willingness to subject nonfiduciaries who knowingly participate in fiduciaries' violations of ERISA to § 502(a)(3) suits. Like the Courts of Appeals for the Fifth and Sixth Circuits, see Kolt, 586 F.3d at 468 n.7; Bombardier, 354 F.3d at 353-54, we do not read Harris Trust as limited in reach only to cases involving § 406(a) transactions between a fiduciary and a party in interest. The Court's reasoning in Harris Trust relied on a textual analysis of § 502(a)(3), its analogue in § 502(a)(5), and the reference in § 502(l) to § 502(a)(5). Defendant status under § 502(a)(3), the Court explained, arises from § 502(a)(3) itself, not from the permutations of the various substantive provisions in ERISA Title I. Harris Trust, 530 U.S. at 245, 249. That the nonfiduciary defendant was a "party in interest" was beside

36

the point; under § 502(a)(3), it was an "other person" that participated in a forbidden "act or practice" and therefore was amenable to suit. Id. at 245 n.2, 248. Barrett, too, is an "other person," as defined in § 502(*l*), who knowingly participated in a fiduciary's breach of a provision of ERISA Title I. See id. at 248.

Finally, our suggestion in Renfro that Harris Trust applies only to nonfiduciary parties in interest to § 406(a) transactions is dicta. And to the extent that Renfro is inconsistent with the reasoning in Harris Trust, we must follow the Supreme Court over our own precedent. See United States v. Tann, 577 F.3d 533, 541-42 (3d Cir. 2009). We have no occasion today to reconsider whether Renfro accurately reflects the construction given to § 502(a)(3) in Harris Trust. It is enough to say that § 406(b) prohibited transactions are more akin to § 406(a) prohibited transactions than to § 404 breaches of fiduciary duty. Because that is so, we follow the Court's guidance in Harris Trust in holding that Barrett was amenable to suit under § 502(a)(3) for his knowing participation in Tri-Core's violation of § 406(b)(3).

## C.

Even if Tri-Core's receipt of commissions from Commonwealth ran afoul of § 406(b)(3), Barrett argues in the alternative, the undisputed reasonableness of its commissions precludes liability. He points to ERISA § 408(b)(2) and (c)(2), provisions he reads to exempt reasonable compensation tainted by self-dealing from the reach of § 406(b)(3). The plaintiffs respond that § 406(b)(3) establishes a per se prohibition on kickbacks and related behavior, regardless of the reasonableness of compensation. Finding the plaintiffs' position convincing, the District Court concluded that § 406(b) enumerates per se violations, the reasonableness of which is immaterial. We agree.

To determine if § 408(b)(2) or (c)(2) excuse Tri-Core's § 406(b)(3) violation, we must "examine first the language of the governing statute, guided not by 'a single sentence or member of a sentence, but look[ing] to the provisions of the whole law, and to its object and policy.'" John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 94-95

37

(1993) (quoting Pilot Life, 481 U.S. at 51) (alterations in original). Section 406(b)(3), as we have noted, provides that "[a] fiduciary with respect to a plan shall not . . . receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). Section 408(b)(2) provides

> The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions: . . . (2) Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

Id. § 1108(b)(2). And § 408(c)(2) provides, in relevant part, Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from . . . (2) receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred[.]

Id. § 1108(c)(2).

We begin with Barrett's effort to invoke § 408(b)(2) as a defense to liability. Section 408(b)(2), by its plain terms, applies only to "transactions . . . with a party in interest." Id. § 1108(b)(2). ERISA § 406(a) proscribes transactions with "part[ies] in interest," but § 406(b) does not. It follows that § 408(b)(2) provides an exemption for § 406(a) transactions, but not for § 406(b) transactions. Accord Patelco Credit Union v. Sahni, 262 F.3d 897, 910 (9th Cir. 2001); Daniels v.

Nat'l Employee Benefit Servs., Inc., 858 F. Supp. 684, 693 (N.D. Ohio 1994); Gilliam v. Edwards, 492 F. Supp. 1255, 1263-64 (D.N.J. 1980). The Department of Labor, the agency charged with administration and enforcement of Title I of ERISA, agrees. It explains that § 408(b)(2) "exempts from the prohibitions of section 406(a) of the Act payment by a plan to a party in interest, including a fiduciary," but "does not contain an exemption from acts described in section 406(b)(1) . . . , section 406(b)(2) . . . or section 406(b)(3)[.]" 29 C.F.R. § 2550.408b–2(a). Barrett's liability derives from his knowing participation in a § 406(b) transaction. Hence, § 408(b)(2) provides him no defense to liability.

The question of whether § 408(c)(2) confers a "reasonable compensation" defense on a § 406(b)(3) violator requires more discussion. We are concerned here with the interaction between two statutes, but first consider the language Congress used in crafting § 406(b)(3). Speaking unequivocally, § 406(b)(3) commands that fiduciaries "shall not" receive consideration in connection with a transaction involving plan assets. 29 U.S.C. § 1106(b)(3). It does not purport to forbid fiduciaries from extracting only *unreasonable* consideration from transactions involving plan assets. To the contrary, it disallows "any consideration," no matter how reasonable or inconsequential. Read most naturally, § 406(b)(3) is a flat prohibition on a fiduciary's receipt of consideration in connection with a transaction involving plan assets. We have previously construed § 406(b)(2), another of the stringent self-dealing prohibited transactions, in the same manner. Section 406(b)(2), we explained, is a "blanket prohibition," Compton, 57 F.3d at 287, one that "creates a per se proscription on the type of transaction in question," see Cutaiar v. Marshall, 590 F.2d 523, 528 (3d Cir. 1979). Even when a transaction discloses "no taint of scandal, no hint of self-dealing, no trace of bad faith" and involves "fair and reasonable" terms, § 406(b)(2) admits of no exceptions. Cutaiar, 590 F.2d at 528.[24]

---

[24] Construing § 406(b)(2) in Cutaiar v. Marshall, we acknowledged that under § 408(a), the Secretary of the Department of Labor may grant an exemption from the strictures of § 406(b) so long as the exemption is published in the Federal Register and a public hearing is held on the

Section 406(b) differs from its neighbor § 406(a) in this regard. Section 406(a) prohibits fiduciaries from causing the plan to engage in certain transactions with parties in interest, "[e]xcept as provided in section [408]." See 29 U.S.C. § 1106(a). But § 406(b) contains no corresponding reference to § 408. To avoid rendering the prefatory clause in § 406(a) mere surplusage, see Board of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 131 S. Ct. 2188, 2196 (2011), we must give meaning to this discrepancy in the § 406 subsections. The Court of Appeals for the Ninth Circuit has reasoned that by prefacing § 406(a), but not § 406(b), with a qualification, Congress tempered § 406(a) transactions, but not § 406(b) transactions, with § 408 exemptions. See Sahni, 262 F.3d at 910. We agree that this is the most sensible construction of these incongruous provisions. By expressly limiting liability under § 406(a) by reference to the exemptions in § 408, then removing the same limiting principle from § 406(b), Congress cast § 406(b) as unyielding.[25]

Barrett urges us to pay no mind to the language of § 406(b), and instead probe only the plain text of § 408(c)(2). Regardless of the character of the § 406(b) prohibitions, he contends, § 408(c)(2) insulates Tri-Core from liability so long as its compensation is reasonable. At first blush, his construction of § 408(c)(2) has some appeal: the provision declares, without limitation, that "nothing" in § 406 —

---

matter. 590 F.2d at 530. Section 408(a)'s burdensome procedures, we reasoned, were indicia of Congress's "intent to create, in [§] 406(b), a blanket prohibition of certain transactions, no matter how fair, unless the statutory exemption procedures are followed." Id. We emphasized, "[E]ach plan deserves more than a balancing of interests. Each plan must be represented by trustees who are free to exert the maximum economic power manifested by their fund whenever they are negotiating a commercial transaction." Id.

[25] A number of district courts have reached the same conclusion. See LaScala v. Scrufari, 96 F. Supp. 2d 233, 239-40 (W.D.N.Y. 2000); Daniels, 858 F. Supp. at 693; Whitfield v. Tomasso, 682 F. Supp. 1287, 1303-04 (W.D.N.Y. 1988); Gilliam, 492 F. Supp. at 1263-64; Marshall v. Kelly, 465 F. Supp. 341, 353-54 (W.D. Okla. 1978).

subsection (a) or (b) — can prohibit a fiduciary from receiving reasonable compensation for servicing the plan. 29 U.S.C. § 1108(c)(2). But Barrett ignores the remainder of § 408(c)(2), which in substance is an exception to that broad general rule. Under § 408(c)(2), persons receiving full-time pay from an employer whose employees are plan participants "shall not receive compensation from such plan." Id. The exception speaks to a matter left unaddressed by the general pronouncement — that is, from whom are they prohibited from receiving reasonable compensation? A fiduciary that falls under the exception cannot receive compensation "from such plan." This language permits an inference that § 408(c)(2) is concerned only with fiduciaries' receipt of compensation from *plans*, not from other companies in which the fiduciary invests plan assets.

By focusing on a particular class of entities that may compensate fiduciaries, the exception may shed light on the scope of § 408(c)(2)'s general rule. But it does not do so unambiguously. Read in conjunction with the exception, the general rule applies only to reasonable compensation paid to a fiduciary by a plan. See Lowen, 829 F.2d at 1216 n.4 ("[S]ervices exempted under ERISA Section 408(c)(2) are services rendered to a plan and paid for by a plan for the performance of plan duties, not services rendered to companies in which a plan invests funds that are paid for by those companies."). Read as a standalone requirement, on the other hand, the general rule exempts a fiduciary from the strictures of § 406(b) so long as compensation is reasonable. See Harley v. Minn. Mining & Mfg. Co., 284 F.3d 901, 909 (8th Cir. 2002) (construing § 408(c)(2) to unambiguously and "sensibly insulate[] the fiduciary from liability [for a § 406(b) violation] if . . . compensation [is] . . . reasonable"). Against the backdrop of these dueling constructions – both plausible – we conclude that § 408(c)(2) is ambiguous. Compounding that ambiguity is the unsettled relationship between § 408(c)(2) and the self-dealing prohibitions of § 406(b) – a relationship informed by Congress's omission of any reference to § 408 in § 406(b).

It is well settled that "when a statutory provision is ambiguous, Chevron, [U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)] dictates that we

41

defer to the agency's reasonable construction of that provision." Cheng v. Att'y Gen., 623 F.3d 175, 187 (3d Cir. 2010). Because we have concluded above that § 408(c)(2) is ambiguous, we look to the Department of Labor's construction of the statute. The Department interprets § 408(c)(2) as a provision that "clarif[ies] what constitutes reasonable compensation for such services," but not as an independently operative reasonable-compensation exception. 29 C.F.R. § 2550.408c-2(a). This reading of § 408(c)(2) is a reasonable construction of the statute insofar as it relates to the § 406(b) prohibited transactions. The "crucible of [Congress's] concern [in enacting ERISA] was misuse and mismanagement of plan assets." Russell, 473 U.S. at 140 n.8. One facet of plan misuse particularly troubling to Congress was self-dealing by fiduciaries. N.L.R.B. v. Amax Coal Co., 453 U.S. 322, 333-34 (1981). Construing § 408(c)(2) to shield self-dealing fiduciaries with a defense whenever reasonable sums change hands would undercut Congress's goal of stamping out conflict-of-interest tainted behavior. Cf. Lowen, 829 F.2d at 1221. This case illustrates the point. Whether or not Tri-Core's compensation was reasonable, the steady inflow of payments from Commonwealth rewarding each sale of a C-group policy may have compromised its best judgment as fiduciary. Skewed judgment of this order ranked among the principal abuses motivating Congress to include the § 406(b) provisions in ERISA in the first place. It is reasonable for the Department of Labor, tasked with implementing § 408(c)(2) in a manner that effectuates Congress's intent, to interpret it as a clarifying provision.

Deferring, as we do, to the Department of Labor's view that § 408(c)(2) is not an independent reasonable compensation exemption, we hold that it affords Barrett no defense to liability for knowingly participating in Tri-Core's § 406(b)(3) violation.

D.

We turn now to the plaintiffs' challenge to the District Court's rejection of their alternative theories of recovery on their § 502(a)(3) claim against Barrett. The District Court found that Tri-Core's receipt of commissions violated § 406(b)(3), but concluded that Tri-Core did not otherwise

breach fiduciary obligations imposed by ERISA §§ 404 and 406(b)(1).[26] Had the District Court determined that Tri-Core violated § 404 or § 406(b)(1) and that Barrett knowingly participated in Tri-Core's conduct, the plaintiffs posit, it might have ordered full, rather than partial, disgorgement of Barrett's ill-gotten commissions. We will affirm the District Court's rejection of the plaintiffs' alternative theories of recovery.

1.

Section 406(b)(1) prohibits a "fiduciary with respect to a plan" from "deal[ing] with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). At trial, the plaintiffs argued that Tri-Core, acting as a fiduciary, violated § 406(b)(1) by misappropriating a portion of their plan contributions as commissions. They understood their contributions as "assets of the plan" and saw Commonwealth's payment of commissions to Tri-Core from its general asset account as Tri-Core's act of self-dealing. The District Court rejected the argument, citing two independent reasons. First, by the time the corporate plaintiffs' contributions reached Commonwealth's commingled general asset account, the court explained, Tri-Core no longer had discretion and control over those assets, and therefore was no longer a fiduciary under ERISA § 3(21)(A). Second, the court reasoned, the contributions were no longer plan assets once they were placed in Commonwealth's general asset account. In the court's view, ERISA § 401(b)(2), the insurer exemption codified at 29

---

[26] The District Court appears to have analyzed the § 406(b)(1) theory in its general discussion of whether the plaintiffs established a § 404 violation. But it clearly addressed the plaintiffs' argument that Tri-Core's alleged misappropriation of plan assets as commissions constituted self-dealing. On appeal, Barrett and the plaintiffs treat this discussion as the court's ruling on the § 406(b)(1) theory. Therefore, notwithstanding the District Court's failure to label its analysis as falling under the rubric of § 406(b)(1), we will address it as such here.

U.S.C. § 1101(b)(2), shielded the corporate plaintiffs' contributions from classification as plan assets.[27]   Under either rationale, Tri-Core did not violate § 406(b)(1) (and Barrett by extension did not knowingly participate in Tri-Core's violation of § 406(b)(1)) because the statute covers only fiduciaries' handling of plan assets.

The plaintiffs maintain on appeal that the second basis for the court's rejection of their § 406(b)(1) theory was error. That is, they object to the court's application of the insurer exemption to the facts of this case.  But they do not challenge the District Court's first holding that Tri-Core lacked discretionary authority over their assets in Commonwealth's general asset account when Commonwealth arranged for payment of commissions to Tri-Core.  Because that holding constituted an independent basis for the District Court's decision, the plaintiffs cannot prevail even if we were to disagree with the applicability of insurer exemption to these circumstances.

In any event, we agree with the District Court that Tri-Core lacked control and discretionary authority over the plan assets in Commonwealth's general asset account, and therefore was no longer a fiduciary.   Under ERISA § 3(21)(A), an entity is a fiduciary with respect to a plan if it (i) "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets" or (ii) "renders investment advice for a fee or other compensation . . . or has any authority or responsibility to do so," or (iii) "has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).  An entity can be a fiduciary with respect to certain plan activities, but not with respect to others.  Renfro, 671 F.3d at 321.  Thus, in every case concerning a fiduciary's obligations under ERISA, the threshold question is whether some person or entity "was acting as a fiduciary (that is, was

---

[27] ERISA contains no comprehensive definition of "plan assets," but gives content to the term through certain exclusions.  John Hancock, 510 U.S. at 89, 95.  Section 401(b)(2), the insurer exemption, is one such exclusion.

performing a fiduciary function) when taking the action subject to complaint." Pegram, 530 U.S. at 226.

No record evidence shows that Tri-Core managed the investment of the plan contributions or otherwise rendered investment advice once the contributions reached Commonwealth. True, Tri-Core directed the trustees' handling of the contributions. But Tri-Core did not direct Commonwealth with respect to its handling of the contributions once they became commingled in its general asset account. Moreover, as the District Court observed, there was neither an allegation nor evidence that Tri-Core and Barrett failed to remit the full value of the corporate plaintiffs' contributions to the trustee. Had Tri-Core siphoned off a percentage of the contributions as compensation before transmitting the balance to the trustee, it might then have exercised discretionary authority over the assets within the scope of ERISA's definition of a plan fiduciary. See 29 U.S.C. § 1002(21)(A). And under those circumstances, the plaintiffs' § 406(b)(1) theory very well might prevail. But that is not the case before us. Because we agree that Tri-Core was not a fiduciary with respect to plan assets by the time Commonwealth paid it commissions, we will affirm the rejection of the plaintiffs § 406(b)(1) theory.[28]

_____

[28] One might wonder how, under the District Court's rationale, Tri-Core was a fiduciary with respect to the § 406(b)(3) transactions, but not with respect to the § 406(b)(1) transactions. The answer lies in the wording of the provisions. The District Court concluded, and Barrett does not dispute, that Tri-Core acted in a fiduciary capacity when it received consideration from Commonwealth "in connection with a transaction involving assets of the plan," in violation of § 406(b)(3). 29 U.S.C. § 1106(b)(3). In connection with the relevant transaction in the § 406(b)(3) claim — Tri-Core and Barrett's recommendation that the corporate plaintiffs adopt plans funded with Commonwealth's insurance policies — Tri-Core did exercise discretion and control over what became plan assets, knowing all the while that it would receive compensation from Commonwealth for its recommendation. But by the time Commonwealth generated the commission — the relevant transaction for the § 406(b)(1)

45

2.

A fiduciary's duties of loyalty and prudence under ERISA § 404 encompass a duty to communicate candidly, Jordan v. Fed. Express Corp., 116 F.3d 1005, 1012 (3d Cir. 1997), and to not "'materially mislead those to whom the duties of loyalty and prudence are owed,'" In re Unisys Corp. Retiree Med. Benefit ERISA Litig., 579 F.3d 220, 228 (3d Cir. 2009) (quoting Adams v. Freedom Forge Corp., 204 F.3d 475, 492 (3d Cir. 2000)). The plaintiffs argued at trial that Tri-Core infringed these duties in several respects. On appeal, they only seriously dispute the District Court's rejection of their theory that the Department of Labor's Prohibited Transaction Exemption 84-24 ("PTE 84-24")[29] supplements the § 404 duties and that Tri-Core failed to comply with PTE 84-24. Like the District Court, we think the plaintiffs' reliance on PTE 84-24 is misplaced. PTE 84-24, much like ERISA § 408, provides conditional exemptions from § 406 prohibited transaction restrictions. It does not create independent affirmative duties. In attempting to shoehorn PTE 84-24 into the substantive duties imposed by § 404, the plaintiffs misconstrue the narrow function of the exemption. Accordingly, we will affirm the District Court's rejection of the plaintiffs' § 404 theory of recovery.

E.

The plaintiffs next object to the District Court's post-trial ruling that ERISA's statute of limitations barred the claims asserted by the Universal Mailing and Alloy Cast plaintiffs against Barrett. The court determined that, in 1990, the principals of those corporations signed a disclosure form attached to the Adoption Agreement that notified them of Tri-Core's commissions from Commonwealth. The form provided:

---

theory — Tri-Core no longer exercised discretion over the plan assets.

[29] 49 Fed. Reg. 13208 (1984), as amended by 71 Fed. Reg. 5887 (2006).

> The Insurer, as defined in the Plan document, is an Insurance Company(ies) selected by Tri Core to provide various Life Insurance Contracts. Tri Core will receive a commission on the purchase of Life Insurance Contracts. The Insurer is not in any way related to Tri Core.

App. 3841 (example of disclosure form); 3844 (Michael Maroney's signature); 3858 (Kenneth Fisher's signature).[30] That disclosure, the District Court held, gave the Universal Mailing and Alloy Cast plaintiffs actual knowledge of Tri-Core's § 406(b)(3) breach and started the statute of limitations clock on any claim to redress the violation.

ERISA's statute of limitations provides, in relevant part:

> No action may be commenced . . . with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part . . . after the earlier of
>
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation.

29 U.S.C. § 1113. This provision "offers a choice of periods, depending on 'whether the plaintiff has actual knowledge of the breach.'" Cetel v. Kirwan Fin. Grp., Inc., 460 F.3d 494, 511 (3d Cir. 2006) (quoting Kurz v. Phila. Elec. Co., 96 F.3d 1544, 1551 (3d Cir. 1996)). "[A]ctual knowledge of a breach or violation requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists." Gluck v. Unisys Corp., 960 F.2d 1168, 1177 (3d Cir.

---

[30] The parties did not locate similar forms from the Finderne and Lima Plastics plaintiffs.

47

1992) (punctuation omitted). "[W]here a claim is for breach of fiduciary duty, to be charged with actual knowledge 'requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated.'" Cetel, 460 F.3d at 511 (quoting Gluck, 960 F.2d at 1178).

The Universal Mailing and Alloy Cast plaintiffs contend that they did not have "actual knowledge" of Tri-Core's breach in 1990 because they did not know at that time that Tri-Core was a fiduciary. This argument is meritless. In the very same disclosure form that alerted the Universal Mailing and Alloy Cast plaintiffs to Tri-Core's commission, they delegated to Tri-Core responsibility for administration of their plans. See App. 3841 ("The Plan Administrator has delegated his duties under the Trust to Tri Core. . . . Tri Core has agreed to serve as the Plan Administrator's delegatee."). Having ceded to Tri-Core discretionary authority to manage and administer plan assets, they plainly were aware that Tri-Core was a fiduciary within the meaning of ERISA § 3(21).

The District Court's finding of actual knowledge nevertheless was clearly erroneous for a different reason. Barrett's liability under § 502(a)(3) was premised on his knowing participation in Tri-Core's receipt of commissions. The disclosure form gave the Universal Mailing and Alloy Cast plaintiffs actual knowledge in 1990 of all facts necessary to understand that an ERISA claim could be lodged against Tri-Core. What matters here is whether they had actual knowledge of all material facts necessary to appreciate that a claim against Barrett existed. The District Court did not consider when the Universal Mailing and Alloy Cast plaintiffs acquired actual knowledge that Barrett participated, knowingly, in Tri-Core's receipt of compensation from Commonwealth. Absent any consideration of those facts, the District Court clearly erred in finding that, by 1990, plaintiffs had actual knowledge of all facts necessary to establish a § 502(a)(3) claim against Barrett. Accordingly, we will vacate the District Court's partial grant of Barrett's motion to amend the judgment on the Universal Mailing and Alloy Cast plaintiffs' ERISA claims and remand for consideration of when they acquired actual knowledge of Barrett's knowing participation in Tri-Core's breach of § 406(b)(3).

F.

Finally, both parties dispute the District Court's rulings on remedies. The plaintiffs contend that the District Court erred in (1) awarding restitution of only half of Barrett's commissions; (2) imposing a prejudgment interest rate commensurate with the interest rate set forth in 28 U.S.C. § 1961; and (3) declining to award attorneys' fees and costs. Barrett's cross appeal contends that the District Court erred in awarding any prejudgment interest.

1.

To remedy Barrett's violation of § 502(a)(3), the District Court awarded the plaintiffs restitution of half of the commissions Barrett received in connection with his sale of C-group policies. The court reached this conclusion by considering the nature of Barrett's liability. Barrett's receipt of commissions from Commonwealth (by way of Tri-Core) was not itself a violation of § 406(b)(3), but rather derived from his knowing participation in Tri-Core's § 406(b)(3) violation. In addition, Barrett passed along 50% of his commissions to others with whom he worked. For these reasons, the District Court deemed it most equitable to order Barrett to disgorge some, but not all, of the compensation he received for his sale and management of the plaintiffs' plans. The plaintiffs contend that the District Court should have awarded full disgorgement of Barrett's commissions because the common law authorized recovery of all profits obtained by wrongful conduct. Barrett responds that partial disgorgement was an appropriate equitable remedy under § 502(a)(3) because he was entitled to some compensation for the services he rendered.[31]

"[A]ppropriate equitable relief" under § 502(a)(3), the Supreme Court instructs, "refer[s] to 'those categories of relief that were *typically* available in equity[.]'" Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209-10 (2002) (quoting Mertens, 508 U.S. at 256) (emphasis in

---

[31] Neither party has suggested that the relief fashioned by the District Court conflicts with the terms of the plans.

original); see also CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1878 (2011); Sereboff v. Mid Atlantic Med. Servs., 547 U.S. 356, 361-62 (2006). To determine if a form of relief was typically available in equity we consult well-known treatises and the Restatements. Great-West, 534 U.S. at 217. Those sources help decipher whether, "[i]n the days of the divided bench," a remedy was equitable in nature, in which case it may be redressed by a § 502(a)(3) action, or legal in nature, in which case it may not. Id. at 212.

It is undisputed that restitution of ill-gotten commissions is an equitable remedy. The Restatement of Restitution provides, "where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary." Restatement of Restitution § 197, at 808 (1937). This rule applies even when the fiduciary's disloyal enrichment causes the beneficiary no harm. Id. § 197, at 809-10, cmt. c. "The rule . . . is not based on harm done to the beneficiary in the particular case, but rests upon a broad principle of preventing a conflict of opposing interests in the minds of fiduciaries, whose duty it is to act solely for the benefit of their beneficiaries." Id. The Restatement of Trusts is in accord: when a fiduciary receives a commission from an insurance company in exchange for purchasing insurance policies as trust assets, "he is accountable for the commission." Restatement (Second) of Trusts § 170, at 370-71, cmt. o (1959).

These authorities instruct that had Tri-Core, as fiduciary, remained in the suit as a defendant, its commissions acquired from Commonwealth in breach of § 406(b)(3) would be subject to a constructive trust for the plaintiffs, who would be entitled to restitution of the payments. See Harris Trust, 530 U.S. at 250 ("The trustee or beneficiaries may . . . maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom."). But what of Barrett, a third party who accepted what he knew to be commissions, obtained in breach of § 406(a)(3)? Here again, the Restatement of Restitution is instructive:

> Where property is held by one person upon a constructive trust for another, and the former transfers the property to a third person who is not a bona fide purchaser, the interest of the beneficiary is not cut off . . . . In such a case he can maintain a suit in equity to recover the property from the third person, at least if his remedies at law are not adequate.

Restatement of Restitution § 160, at 647, cmt. g; see also id. § 201, at 813-14. The plaintiffs' interest in the constructive trust placed over Tri-Core's commissions, the Restatement suggests, is not diminished because Tri-Core transferred a portion of its commissions to Barrett. On this understanding, Barrett should be held accountable for the commissions he knowingly received by way of Tri-Core's fiduciary breach. Cf. Skretvedt, 372 F.3d at 213-14 (analyzing the constructive trust remedy and concluding that, in a case involving unpaid benefits, "Dobbs, Palmer, and the Restatement all make clear that the constructive trust remedy typically would allow [the beneficiary], in equity, to force [the plan administrator] to disgorge the gain it received on his withheld benefits under a restitutionary theory").

We now reach the nub of the controversy: did the District Court have discretion to halve the commissions recoverable from Barrett? ERISA § 502(a)(3) authorizes suits for "appropriate equitable relief." 29 U.S.C. § 1132(a)(3) (emphasis added). Our Court recently construed the term "appropriate" to confer discretion on district courts, sitting as courts of equity, to limit equitable relief by doctrines and defenses traditionally available at equity. US Airways, Inc. v. McCutchen, 663 F.3d 671, 676 (3d Cir. 2011), cert. granted, 80 U.S.L.W. 3638 (U.S. Jun. 25, 2012) (No. 11-1285). It is a bedrock principle of equity that courts possess discretion to limit equitable relief. See, e.g., 1 Dan B. Dobbs, Law of Remedies § 2.4(1), at 91-92 (2d ed. 1993). Equitable discretion enables a court to shape relief "to fit its view of the balance of the equities and hardships," id. § 2.4(1) at 92, and to fashion relief tailored to the unique circumstances of a case. See Brown v. Plata, 131 S. Ct. 1910, 1944 (2011) ("Once invoked, the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are

51

inherent in equitable remedies."); Holland v. Florida, 130 S. Ct. 2549, 2563 (2010) ("[W]e have . . . made clear that often the 'exercise of a court's equity powers . . . must be made on a case-by-case basis.'" (quoting Baggett v. Bullitt, 377 U.S. 360, 375 (1964))).

In limiting the plaintiffs' recovery to partial disgorgement of Barrett's ill-gotten commissions, the District Court did precisely what equity enables it to do: it exercised its discretion not to award complete relief after balancing the equities and hardships. It was within the District Court's discretion under § 502(a)(3) to consider the role that Barrett played as a nonfiduciary with respect to the plaintiffs' plans and the amount of commissions he actually retained. See Dobbs, Law of Remedies § 2.4(5), at 109-10; see also Amara, 131 S. Ct. at 1880 (referring to a district court's "discretion under § 502(a)(3)"). In light of Barrett's comparatively minor role in the underlying ERISA violation and his redistribution of a portion of the commissions to co-brokers, the District Court did not abuse its discretion by ordering Barrett to disgorge some, but not all, of his compensation for marketing and servicing the plaintiffs' plans. Accordingly, we will affirm the award of restitution.

2.

The District Court also awarded the plaintiffs prejudgment interest on the disgorged commissions. Section 502(a)(3) authorizes a court to award prejudgment interest as a form of appropriate equitable relief. Fotta v. Trs. of the United Mine Workers of Am., 319 F.3d 612, 616 (3d Cir. 2003). Both parties object to the prejudgment interest rate applied by the District Court. We review such challenges for abuse of discretion. Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 133 (3d Cir. 2000).

Prejudgment interest exists to make plaintiffs whole and to preclude defendants from garnering unjust enrichment. Id. at 132. Recognizing these goals, the District Court first explained that prejudgment interest was "not necessarily required" to make the plaintiffs whole. App. 71. This was so because, in the court's view, the plaintiffs received all benefits to which they were entitled under their plans and

52

because Tri-Core's commissions came from Commonwealth's general asset fund, not directly from the plans. On the other hand, the District Court reasoned, some prejudgment interest was necessary to prevent Barrett from unjustly retaining compensation from transactions that plainly conflicted with the plans' interests. Balancing these equities, the District Court imposed a modest prejudgment interest rate of 3.91%. It borrowed this rate from the post-judgment interest rate set by 28 U.S.C. § 1961 and applied the average rate from the time the plaintiffs established the plans to the date of the order.

The plaintiffs contend that the District Court should have awarded prejudgment interest at the rate of return of a typical retirement account because their money would have earned interest at that rate had it been invested in a tax-compliant vehicle. This may be so, but Barrett's knowing participation in Tri-Core's receipt of commissions — the basis for ERISA liability — has little to do with whether the plaintiffs selected the best investment vehicle for retirement savings. The plaintiffs offer no argument that calls into question the District Court's conclusion that, because they received the benefits to which they were entitled under the plans, prejudgment interest was unnecessary to fully compensate their injuries.

Barrett contends that because the District Court found that prejudgment interest was not needed to make the plaintiffs whole, they should not have been awarded interest on Barrett's commissions. That argument neglects that prejudgment interest aims to make plaintiffs whole and to prevent unjust enrichment. Holmes, 213 F.3d at 132. Alternatively, relying on a denial-of-benefits case, Barrett argues that because his commissions were reasonable, there was no unjust enrichment. The argument misapprehends the nature of the ERISA violation for which he was found liable. Section 406(b) enumerates per se harms, the commission of which is itself a wrong, irrespective of the reasonableness of the ill-gotten profits. The mere fact of Barrett's knowing participation in the § 406(b) violation indicates that, to some extent, both Barrett and Tri-Core were unjustly enriched by their self-dealing. For the same reason, Barrett's final argument — that he did not act wrongfully — is baseless.

53

Neither parties' objections to the prejudgment interest rate are persuasive. We have emphasized that, in reviewing a District Court's assignment of prejudgment interest, "what matters is . . . whether its balancing of the equities amounted to an abuse of discretion." Id.; see also Restatement (Second) of Trusts § 207(1), at 468 ("Where the trustee commits a breach of trust and thereby incurs a liability for a certain amount of money with interest thereon, he is chargeable with interest at the legal rate or such other rate as the court in its sound discretion may determine[.]"). The District Court thoughtfully weighed the interests in making the plaintiffs whole and in avoiding Barrett's unjust enrichment. Its application of a modest prejudgment interest rate was not an abuse of discretion.

3.

Finally, the plaintiffs contend that they are entitled to attorneys' fees and costs. ERISA provides that a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Supreme Court construes this provision to permit a district court to award fees and costs to any party that has achieved "'some degree of success on the merits.'" Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2149, 2158 (2010) (quoting Ruckelshaus v. Sierra Club, 463 U.S. 680, 694 (1983)). Once satisfied that a party has met that threshold standard, the court must consider the following policy factors in determining whether to award fees and costs:

> (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deter[r]ent effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position.

Ursic v. Bethlehem Mines, 719 F.2d 670, 673 (3d Cir. 1983). We review a challenge to a district court's allocation of counsel fees and costs for abuse of discretion. MacPherson v.

54

Employees' Pension Plan of Am. Re-Ins. Co., 33 F.3d 253, 256 (3d Cir. 1994).

The District Court considered each of the discretionary factors before denying the plaintiffs' request for fees and costs. In the court's view, Barrett was minimally culpable when compared with Redfearn, the mastermind behind EPIC, and Tri-Core, the entity that breached its fiduciary duties. In addition, the court found, imposition of fees would have negligible deterrent effect, many of the plaintiffs' claims lacked merit, and the case conferred no benefit on the plans, for the plans were inoperative by the close of the trial. Weighing against those considerations, the court reasoned, was Barrett's ability to satisfy a fee award. Because this factor did not counterbalance the other four, however, the court declined to award fees and costs under § 1132(g)(1).

The plaintiffs contest the District Court's application of the Ursic factors to the factual record. While they construe the evidence differently, they fall short of establishing that the District Court abused its discretion in balancing the factors. The court thoughtfully considered each factor, and its characterization of the evidence is well founded in the record. We will affirm its denial of attorneys' fees and costs.

V.

The plaintiffs mount a number of challenges to rulings made by the District Court with respect to the civil RICO and common law breach of fiduciary duty claims. The jury returned a verdict in favor of Barrett on the former and the plaintiffs on the latter. For the reasons that follow, we will vacate the verdict on the RICO claim and remand for retrial. We will affirm in all other respects.

A.

The plaintiffs' principal objection to the District Court's rulings in the jury trial involves the jury charge on the civil RICO claim against Barrett. After the parties rested, the court determined that it would instruct the jury not to consider evidence concerning Barrett's receipt of commissions in its assessment of the RICO claim. App. 7707-08; 7769. We

55

review the propriety of this instruction for abuse of discretion. United States v. Dobson, 419 F.3d 231, 236 (3d Cir. 2005); Livingstone v. N. Belle Vernon Borough, 91 F.3d 515, 524 (3d Cir. 1996).

The RICO statute provides a civil cause of action to "[a]ny person injured in his business or property by reason of violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962, which contains RICO's criminal provisions, makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The Supreme Court has distilled the provision into four components: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).[32]

"Racketeering" may include mail or wire fraud under 18 U.S.C. §§ 1341 and 1343. See 18 U.S.C. § 1961(1). The plaintiffs based their RICO claim on these predicate offenses. The elements of mail and wire fraud are (1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme. United States v. Riley, 621 F.3d 312, 329 (3d Cir. 2010); United States v. Yusuf, 536 F.3d 178, 187-88 & n.14 (3d Cir. 2008). Thus, the plaintiffs maintained that Barrett was associated with Tri-Core, an enterprise, and participated in its pattern of committing mail and wire fraud through a specific scheme to defraud.

The plaintiffs' theories as to what constituted Tri-Core's "scheme to defraud" had a chameleonic quality throughout the proceedings. By the time of trial, they had

---

[32] The complaint initially asserted five RICO claims alleging separate theories of enterprise. By the time of trial, the claims were narrowed to the single theory that Tri-Core operated as an enterprise within the meaning of RICO. Barrett does not challenge this characterization of Tri-Core on appeal.

settled on four general formulations of the alleged scheme: (1) Barrett and Tri-Core misled the plaintiffs into participating in EPIC in order to generate grossly excessive compensation for themselves; (2) Tri-Core and Barrett misled them into participating in EPIC by concealing the commissions they would receive; (3) Tri-Core and Barrett misled them into participating in EPIC by misrepresenting the tax benefits and drawbacks of the plan; and (4) Tri-Core and Barrett misled them into participating in EPIC by misrepresenting the existence of a reserve fund and the accessibility of conversion credits. The plaintiffs encouraged the District Court to charge the jury that it could find any one of the alleged schemes constituted a scheme to defraud.

Before charging the jury, however, the District Court announced that it would limit the jury's consideration of both theories involving Barrett's receipt of commissions. That is, it would not permit the jury to find a scheme to defraud based on the plaintiffs' first or second theory. Accordingly, the District Court instructed the jury:

> You should know that I will be deciding the issues plaintiffs have raised regarding the defendants' commissions. You've heard a lot of questions about how much and when and so forth and so on. All right. Those issues you will not be deciding one way or another. So you should disregard all testimony regarding the commissions received by the defendant. You will concentrate on the other issues raised by the plaintiffs.

App. 7769. In place of the commissions theories, the District Court instructed, the jury could rely only on the following to determine whether the plaintiffs established a scheme to defraud:

> The plaintiffs allege that Barrett committed the following racketeering acts; that defendant Barrett used the mails to further a fraudulent scheme or artifice to sell insurance through misrepresentations which involved preparing promotional materials that contain[ed]

57

affirmative misrepresentations, and omitted to disclose material information, the sending of money through the mails and the distributions of money in the form of contributions and otherwise to defraud plaintiffs and others regarding the tax benefits of an employee welfare benefit plan.

App. 7775-76. The plaintiffs objected and argued that by paring down the instruction and taking from the jury the question of whether excessive or concealed commissions amounted to a scheme to defraud, the District Court "eviscerated" their RICO claim. Reply Br. 24.[33]

We begin by considering the plaintiffs' objection to the excision of the excessive compensation theory from the jury charge. The District Court did not instruct the jury to decide if Barrett and Tri-Core extracted excessive commissions because it believed the plaintiffs presented no evidence that Tri-Core and Barrett's commissions were excessive by industry standards. The court reasoned that "the amount of the commissions in this case . . . cannot be characterized," and the plaintiffs' failure to adduce any such evidence left nothing for the jury to consider. App. 7707-08. On appeal, the plaintiffs protest that there was "overwhelming" evidence that the commissions were excessive. Reply Br. 21. But they fail to identify a single item of evidence from which a juror could conclude that Tri-Core and Barrett misrepresented information in order to generate unreasonably high compensation.[34] Nor does our

_____

[33] Barrett argues in passing, and without legal citation, that it was "necessary to instruct the jury to disregard commissions evidence since the district court would be considering that in connection with the ERISA claim." Barrett Br. 25. We see no reason, however, why the plaintiffs cannot recover under both ERISA and RICO for harms derived from Tri-Core and Barrett's receipt of commissions from Commonwealth. It bears repeating that ERISA § 502(a)(3) allows for only equitable relief. The civil RICO statute (18 U.S.C. § 1964(c)), on the other hand, authorizes treble damages.

[34] The plaintiffs' only argument in this regard is: "Barrett's commissions were clearly excessive based on the facts that

58

review of the record reveal a basis on which a jury could find Tri-Core and Barrett's compensation disproportionately high compared to relevant industry standards. In light of this failure of proof, the District Court did not abuse its discretion in refusing to instruct the jury to consider whether Barrett generated excessive commissions as part of a scheme to defraud.

The District Court's excision of the concealed compensation theory from the jury charge presents a more difficult issue. We have not located any explanation in the record for the court's decision not to permit the jury to consider the theory. Nor has Barrett pointed us to any basis for the decision. Concealment of material facts in order to obtain money through such concealment, the plaintiffs correctly argue, may constitute fraud under 18 U.S.C. §§ 1341 and 1343. United States v. Bryant, 655 F.3d 232, 249 (3d Cir. 2011). Indeed, we have explained that the mail fraud statute "'has been expansively construed to prohibit all schemes to defraud by any means of misrepresentation that in some way involve the use of the postal system.'" United States v. Olatunji, 872 F.2d 1161, 1166 (3d Cir. 1989) (quoting United States v. Boffa, 688 F.2d 919, 925 (3d Cir. 1982)). There was conflicting evidence at trial about whether Tri-Core and Barrett made sufficient disclosures to the plaintiffs about the source and quantity of their compensation. And there was an adequate evidentiary basis on which a jury could find that Tri-Core and Barrett were not truthful about their commissions. Under the circumstances, it was an abuse of discretion for the District Court to refuse to instruct the jury that this evidence could constitute a scheme to defraud under the mail and wire fraud statutes.[35]

---

they were undisclosed; that they were significantly greater than the amounts that the Plaintiffs anticipated Barrett would receive; and that they were disproportionate to not only the amount of time that Barrett devoted to the Plaintiffs but also to the value of his services." Reply Br. 22. These facts have nothing to do with whether they were excessive by industry standards.

[35] The plaintiffs also argued to the District Court that PTE 84-24 imposed on Barrett a separate duty to disclose information to them about his commissions. App. 7682. The District

The District Court's refusal to charge the jury on the concealed commissions theory was not harmless error. See 28 U.S.C. § 2111 (requiring reviewing courts to issue judgment "without regard to errors or defects which do not affect the substantial rights of parties"). In instructing the jury to disregard the mountain of evidence pertaining to Tri-Core and Barrett's commissions, the court withdrew a large swath of the case from the jurors' deliberations. We question whether any jury could separate the commissions testimony from the rest of the case. Testimony concerning the plaintiffs' knowledge of Barrett and Tri-Core's commissions was intertwined with testimony concerning the scheme in general. We cannot know whether the instruction to ignore testimony on commissions infected the jury's consideration of the plaintiffs' other scheme-to-defraud theories. At a minimum, though, it is not "highly probable" that the instruction did not affect the plaintiffs' substantial rights. See McQueeney v. Wilmington Trust Co., 779 F.2d 916, 923-27 (3d Cir. 1985). We therefore we will vacate the jury's verdict on the RICO claim and remand for retrial.[36]

B.

The plaintiffs next challenge the damage award on the breach of fiduciary duty claim. They objected to the award in their motion for a new trial, which was denied by the District Court. We review the denial of a motion for a new trial for abuse of discretion. Thabault v. Chait, 541 F.3d 512, 532 (3d Cir. 2008).

The plaintiffs' argument is premised on the jury's alleged confusion with respect to the verdict form. The District Court initially handed the jury a simple verdict form

Court rightly understood PTE 84-24 as supplying an exemption from liability for prohibited transactions under ERISA rather than an independent duty to disclose. See App. 7815.

[36] Because we have ordered a new trial on the RICO claim, we need not consider the plaintiffs' argument that statements made by Barrett's counsel at summation prejudiced the jury's resolution of the claim.

60

with one line to fill in damages for each group of plaintiffs. The following day, the court provided the jury with an optional supplemental verdict form that broke down the damages for each group of plaintiffs into several line items. Over the course of its deliberations, the jury asked the court a question, in writing, about the form. Ultimately, its verdict sheet listed one damages sum for each cluster of plaintiffs, not broken into component parts.

The plaintiffs moved for a new trial on the basis that the verdict form was inconsistent and that the jury awarded insufficient damages. The District Court denied the motion on the merits and noted that, in any event, the plaintiffs did not timely object to the form of the verdict sheet. On appeal, the plaintiffs contend that because the jury did not fill in the supplemental verdict form, they are entitled to a new trial. The argument is not well taken. The jury was under no obligation to fill out the supplemental form, and the District Court was correct to point out that the plaintiffs' failure to object timely rendered the argument waived. We conclude that the District Court did not abuse its discretion in declining to upset the jury's verdict on the breach of fiduciary duty claim.

C.

The plaintiffs next contend that the District Court lacked a legal basis for instructing the jury to apportion liability. New Jersey law permits a tortfeasor to request apportionment of damages among multiple responsible parties. N.J. Stat. Ann. § 2A:15-5.2. An apportionment instruction may be given if the trial court determines, "as a matter of law, [that] the jury is capable of apportioning damages." Campione v. Soden, 695 A.2d 1364, 1375 (N.J. 1997). "The absence of conclusive evidence concerning allocation of damages will not preclude apportionment by the jury[.]" Id. Rather, the trial court need only determine "whether there is any rational basis for the jury to conclude that the respective fault of each defendant can be apportioned." Baglini v. Lauletta, 768 A.2d 825, 838 (N.J. Super. App. Div. 2001). An instruction may be given even if the other tortfeasors have settled with the plaintiff, are deceased (like Redfearn), or have declared bankruptcy (like

61

Tri-Core). Young v. Latta, 589 A.2d 1020, 1021 (N.J. 1991). These permissive standards reflect New Jersey's policy of favoring apportionment among responsible parties. See Boryszewski ex rel. Boryszewski v. Burke, 882 A.2d 410, 423 (N.J. Super. App. Div. 2005).

Barrett requested that the jury apportion damages between himself and Tri-Core and Redfearn, both absent defendants, for the breach of fiduciary duty claim. He had previously asserted a cross-claim against Tri-Core and Redfearn for negligence. In Barrett's view, a portion of the plaintiffs' harm was attributable to Tri-Core and Redfearn's negligent misrepresentations about EPIC's tax consequences. Over the plaintiffs' objection, the District Court gave the instruction. The jury ultimately divided responsibility evenly between Barrett and Tri-Core/Redfearn (treated as one entity), thus halving the damages recoverable from Barrett.

The plaintiffs maintain that neither Tri-Core nor Redfearn could be found liable for negligently misrepresenting the tax risks of EPIC. This argument, we conclude, is meritless. As an initial matter, we find no error in the District Court's legal conclusions. To prove negligent misrepresentation, a party must establish "'[a]n incorrect statement, negligently made and justifiably relied on, [that] may be the basis for recovery of damages for economic loss . . . sustained as a consequence of that reliance.'" Singer v. Beach Trading Co., 876 A.2d 885, 890-91 (N.J. Super. Ct. App. Div. 2005) (quoting McClellan v. Feit, 870 A.2d 644, 650 (N.J. Super. Ct. App. Div. 2005)); see also Restatement (Second) of Torts § 552 (1965). Material omissions, too, can support liability for negligent misrepresentation if a party has a duty to disclose. Karu v. Feldman, 574 A.2d 420, 426 (N.J. 1990). The District Court concluded that Tri-Core and Redfearn, the architects of EPIC, had a duty to disclose known tax risks by virtue of their special relationship with the plaintiffs, ascertainable and predictable members of the class of potential investors in the plan. See People Express Airlines v. Consol. Rail Corp., 495 A.2d 107, 112 (N.J. 1985). We agree. It was foreseeable that the plaintiffs would rely on their representations about the integrity of the claimed tax benefits.

We also find no error in the District Court's conclusion that the record disclosed a rational basis upon which a jury could deem Tri-Core and Redfearn partially responsible for the plaintiffs' loss. Trial testimony supplied a sound evidentiary predicate for the conclusion that Tri-Core and Redfearn made affirmative misrepresentations or material omissions on which the plaintiffs justifiably relied to their detriment. Tri-Core and Redfearn created the brochures and marketing materials used by Barrett to promote EPIC, materials that trumpeted the tax benefits of EPIC plans while disguising their unsteady grounding in the tax code. All the while, Tri-Core and Redfearn knew that there was doubt about the deductibility of the contributions made under the scheme. The plaintiffs knew that Tri-Core and Redfearn were the architects of EPIC and reasonably accepted their representations as made by experts peddling a secure investment vehicle. As we have explained, New Jersey law sets a low bar for the quantum of evidence needed to obtain an instruction on comparative fault. See Boryszewski, 882 A.2d at 418. In light of this standard, the District Court properly granted Barrett's request to apportion damages for the breach of fiduciary duty claim.

## D.

Finally, the plaintiffs contend that the District Court erred in granting Barrett judgment as a matter of law on their claim for punitive damages under N.J. Stat. Ann. § 2A:15-5.9 et seq. Our review of an order granting judgment as a matter of law is plenary. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). The plaintiffs maintain that the evidence adduced at trial was sufficient to permit the jury to consider whether Barrett's breach of fiduciary duty warranted punitive damages. We disagree. Trial testimony did not disclose clear and convincing evidence that Barrett acted with actual malice or with wanton and willful disregard of harm in recommending EPIC to the plaintiffs. N.J. Stat. Ann. § 2A:15-5.12.

## VI.

We wish to commend the District Court on its exemplary handling of this difficult matter. For the reasons

discussed, we will affirm its judgments in all respects but three. We will vacate the District Court's partial grant of summary judgment in favor of Barrett regarding plaintiffs' state law claims to the extent that they allege that Barrett misrepresented the existence of a reserve fund, the availability of conversion credits, and the nature of his commissions before adoption of the EPIC plans and remand for further proceedings consistent with this opinion. We will vacate the jury's verdict on the plaintiffs' RICO claim and remand for retrial consistent with this opinion. And, insofar as it held the Universal Mailing and Alloy Cast plaintiffs' ERISA claims time-barred, we will vacate the District Court's partial grant of Barrett's motion to amend the judgment and remand for further proceedings.